# Judge Hellerstein

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



**07 CV 2777**

THE COUNTY OF ORANGE,

Civil Action No.

Plaintiff,

-against-

**COMPLAINT**

ABBOTT LABORATORIES, INC.; AGOURON
PHARMACEUTICALS, INC.; ALCON LABORATORIES,
INC.; ALLERGAN, INC.; ALPHARMA, INC.; AMGEN,
INC.; APOTEX INC.; ASTELLAS PHARMA US, INC.;
ASTRAZENECA PHARMACEUTICALS L.P.; AVENTIS
BEHRING L.L.C.; AVENTIS PHARMACEUTICALS INC.;
BARR LABORATORIES, INC.; BERLEX
LABORATORIES, INC.; BOEHRINGER INGELHEIM
CORPORATION; BOEHRINGER INGELHEIM PHARMA.,
INC.; BRISTOL-MYERS SQUIBB COMPANY; DERMIK
LABORATORIES INC.; DEY INC.; EISAI INC.; EISAI CO.
LTD.; ELI LILLY AND COMPANY; ENDO GEN. PROD.;
ENDO PHARMACEUTICALS INC.; ENDO
PHARMACEUTICALS HOLDINGS INC.; FOREST
PHARMACEUTICALS, INC.; FOREST LABORATORIES
INC.; GENENTECH, INC.; GENEVA
PHARMACEUTICALS; GENZYME CORPORATION;
GILEAD SCIENCES, INC.; GLAXO WELLCOME
INC.; GLAXOSMITHKLINE PLC; GREENSTONE LTD.;
HOFFMANN-LA ROCHE INC.; IMMUNEX CORP.; IVAX
PHARMACEUTICALS INC.; JANSSEN
PHARMACEUTICA PRODUCTS L.P.; JOHNSON
& JOHNSON GROUP; KING PHARMACEUTICALS, INC.;
KREMERS URBAN DEV. CO.; MALLINCKRODT INC.;
MEDIMMUNE, INC.; MCNEIL CONSUMER; MCNEIL PPC
INC.; MERCK & CO. INC.; MONARCH
PHARMACEUTICALS INC.; MYLAN
PHARMACEUTICALS INC.; MYLAN LABORATORIES,
INC.; NOVARTIS PHARMACEUTICAL CORPORATION;
NOVO NORDISK PHARMACEUTICALS, INC.;
ONCOLOGY THERAPEUTICS CORP.; ORGANON
PHARMACEUTICALS USA INC.; ORTH-BIOTECH
PRODUCTS L.P.; ORTHO-MCNEIL PHARMACEUTICAL,
INC.; OTSUKA AMERICA, INC.; PAR
PHARMACEUTICAL COMPANIES, INC.; PAR

RECEIVED
APR 05 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Demands a
Trial by Jury

PHARMACEUTICAL INC.; PFIZER INC.; PROCTOR & GAMBLE PHARMACEUTICALS, INC.; PURDUE PHARMA COMPANY; PURDUE FREDERICK COMPANY; PURDUE PHARMA L.P.; PUREPAC PHARMACEUTICAL CO.; PHARMACIA & UPJOHN, INC.; RANBAXY PHARMACEUTICALS INC.; ROCHE LABORATORIES INC.; SANDOZ INC.; SANOFI SYNTHELABO INC.; SANOFI-AVENTIS; SCHERING-PLOUGH CORPORATION; SCHWARZ PHARMA HOLDINGS, INC.; SEPRACOR INC.; SHIRE PLC; SHIRE US INC.; SMITH KLINE BEECHAM CORP.; TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.; TAKEDA PHARMACEUTICAL CO. LTD.; TAP PHARMACEUTICALS INC.; TAP PHARMACEUTICAL PRODUCTS INC.; TARO PHARMACEUTICALS INDUSTRIES LTD; TARO PHARMACEUTICALS U.S.A. INC.; TEVA PHARMACEUTICAL INDUSTRIES LTD; TEVA PHARMACEUTICALS INDUSTRIES, LTD; TYCO HEALTHCARE; UCB PHARMA, INC.; UCB, S.A.; WARRICK PHARMACEUTICALS; WATSON PHARMACEUTICALS, INC.; WATSON PHARMA INC.; WYETH; and ZENECA HOLDINGS INC.;

Defendants.

—————————————————————X

## TABLE OF CONTENTS

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.   JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

III.  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

IV.   GENERAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

      A.    MEDICAID STATUTORY SCHEME . . . . . . . . . . . . . . . . . . . . . . . -18-

            1.    New York Calculates Medicaid Drug Costs Based on AWP . . . . . . . -19-
            2.    Defendant's Manipulation of the Medicaid Rebate Program . . . . . . . -21-

      B.    Defendant DRUG MANUFACTURERS' FRAUDULENT
            CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

            1.    Reporting of False and Inflated AWPS . . . . . . . . . . . . . . . . . . . . . -24-
            2.    Failure To Report Best Prices . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-
            3.    Failure To Pay Proper Rebates . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

V.    GOVERNMENT INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

VI.   ALLEGATIONS PARTICULAR TO THE COUNTY AND THE INDIVIDUAL
      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

            A.    Abbott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-
            B.    Alcon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-
            C.    Allergan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-
            D.    Alpharma Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . -46-
            E.    Amgen Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -47-
            F.    Apotex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -48-
            G.    Astellas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -49-
            H.    AstraZeneca Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . -50-
            I.    Barr . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -52-
            J.    Berlex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -53-
            K.    Boehringer Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . -54-
            L.    Bristol-Myers Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . -56-
            M.    Dey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -58-

N.   Eisai . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -59-
O.   Eli Lilly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -60-
P.   Endo Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -62-
Q.   Forest Pharm Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -62-
R.   Genentech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -64-
S.   Genzyme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-
T.   Gilead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -66-
U.   GSK Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -67-
V.   Hoffmann-La Roche Defendants . . . . . . . . . . . . . . . . . . . . . . . . . -68-
W.   Ivax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -70-
X.   Johnson & Johnson Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . -71-
Y.   King Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -72-
Z.   Medimmune . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -73-
AA.   Merck . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -74-
BB.   Mylan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -75-
CC.   Novartis Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -77-
DD.   Novo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -78-
EE.   Otsuka . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -79-
FF.   Procter & Gamble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -80-
GG.   Par Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -81-
HH.   Pfizer Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -82-
II.   Purdue Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -83-
JJ.   Ranbaxy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -84-
KK.   Sanofi-Aventis Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-
LL.   Schering Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -87-
MM.   Schwarz Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -88-
NN.   Sepracor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -89-
OO.   Shire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -90-
PP.   Takeda Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -91-
QQ.   TAP Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -92-
RR.   Taro Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -94-
SS.   Teva Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -95-
TT.   Tyco Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -96-
UU.   UCB Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -97-
VV.   Watson Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -98-
WW.   Wyeth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -99-

VII.   DAMAGES TO ORANGE COUNTY'S MEDICAID PROGRAM . . . . . . . . . . . . -100-

IX.   CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -101-

COUNT I:    VIOLATIONS OF 18 U.S.C. § 1962 (C) ("R.I.C.O")
            (AGAINST Defendant DRUG MANUFACTURERS
            FOR UNLAWFUL CONDUCT ASSOCIATED WITH
            MEDICAID COVERED DRUGS) ........................ -101-

COUNT II:   VIOLATION OF FEDERAL MEDICAID STATUTE,
            42 U.S.C. §1396r-8 (FAILURE TO COMPLY WITH
            FEDERAL MEDICAID REBATE PROVISION) .............. -151-

COUNT III:  VIOLATION OF N.Y. SOCIAL SERVICES LAW § 367-A(7)(d)
            (FAILURE TO COMPLY WITH STATE MEDICAID REBATE
            PROVISION TO PROVIDE BEST PRICE) .................. -153-

COUNT IV:   VIOLATION OF N.Y. SOCIAL SERVICES LAW § 145-b
            (OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS) .... -154-

COUNT V:    VIOLATION OF NEW YORK DEPARTMENT OF HEALTH
            REGULATIONS 18 N.Y.C.R.R § 515.2(b)(4) and (5) ........... -155-

COUNT VI:   BREACH OF CONTRACT ............................... -156-

COUNT VII:  UNJUST ENRICHMENT ............................... -157-

COUNT VIII: VIOLATION OF NEW YORK GENERAL BUSINESS
            LAW § 349 Et Seq. (DECEPTIVE ACTS UNFAIR TRADE
            PRACTICES) ........................................ -158-

COUNT IX:   EQUITABLE SUBROGATION ........................... -160-

COUNT X:    FRAUD ........................................... -161-

COUNT XI:   FRAUDULENT CONCEALMENT ....................... -162-

PRAYER FOR RELIEF ............................................ -164-

Plaintiff, the County of Orange ("Orange County"), by and through its attorneys, LEVY PHILLIPS & KONIGSBERG, L.L.P., brings this action under 18 U.S.C. § 1962(c)("RICO"), 42 U.S.C. § 1396r-8, New York Social Service Laws § 367-a(7)(d) and § 145-b, New York Department of Health Regulations 18 N.Y.C.R.R. §§ 515.2(b)(4) and (5), New York General Business Law § 349 et seq., and for equitable subrogation, breach of contract, unjust enrichment, fraud, and fraudulent concealment, to recover monetary damages, civil penalties, declaratory and injunctive relief, restitution, disgorgement of profits, treble and punitive damages, suffered by Orange County as a result of the Defendants' fraudulent scheme to overcharge the Medicaid Program. For its complaint against the above-captioned Defendants, based on investigation, information and belief, Plaintiff alleges as follows:

## I.   INTRODUCTION

1.      This action is brought by Plaintiff, Orange County, which like all New York counties, is required by state law to participate in the administration of the state Medicaid program. While the federal government funds 50 percent of Medicaid prescription costs, and New York State pays 25 percent, Orange County is responsible for the other 25 percent of the Medicaid prescription costs incurred by its residents. N.Y. Soc. Serv. L. §§ 367-a and 368-a; 42 U.S.C. § 1396d(b). For example, from June 2002 - June 2006, Orange County's Medicaid Program paid over $188,547,473.24 in prescription drug costs for its residents. This averages to approximately $47,136,868.31 per year.[1]

2.      The total price that New York State and Orange County pay for prescription drugs is composed of two costs. First, a fee is paid to the pharmacy or the provider of the drug. The fee

---

[1]      This a representative period, Plaintiff does not limit its claims herein to these dates.

paid to the provider is based on a formula contained in New York State law and is calculated using an average wholesale price ("AWP")[1] or wholesale acquisition cost ("WAC") provided by the Defendant pharmaceutical manufacturers for each of their drugs. N.Y. Soc. Serv. L. § 367-a(9). Second, Defendants are legally bound, pursuant to contracts each manufacturer enters into with the Secretary of the Department of Health and Human Services, to pay Medicaid a rebate. 42 U.S.C. § 1396r-8. The amount of the rebate owed by the manufacturer is set by each manufacturer's own price data and information collected by the State Medicaid Plans.

3. The Defendants named herein are companies currently or formerly engaged in the business of manufacturing, selling, and/or marketing drugs in Orange County and throughout the United States ("drug manufacturers"). They have engaged in a longstanding scheme to manipulate drug prices and defraud Medicaid out of billions of dollars.

4. Defendants' scheme is twofold. First, Defendants' report false and inflated average wholesale prices or wholesale acquisition costs to third-party publishing entities such as RedBook, Medi-span or Bluebook. Second, Defendants fail to report correctly their "best price" for each drug sold to Medicaid. In turn, Defendants reporting of false prices pervades the entire Medicaid system by creating an inflated price for Medicaid to pay and results in the collection of an illegal overpayment and profit for the Defendants.

5. Various governmental and private investigations done in recent years reveal that the Defendants falsely reported inflated Average Wholesale Prices. This amounts to a fraud on the Medicaid system because the price paid by Medicaid for a drug is based on the inflated AWP minus

---

[1] For reference, the meaning of this and all abbreviations used herein are annexed to the last page of Plaintiff's Complaint.

a certain minor percentage.

6.     In the United States, there is a different AWP published for each drug dosage and package size (e.g. number of pills per container).

7.     The Defendants provide companies that publish Average Wholesale Prices, known as Publishers, with grossly exaggerated pricing information. If a Defendant provides a Publisher an AWP that figure is published. In the instance where a Defendant provides a WAC, the Publisher converts this figure into an AWP for publication.

8.     Because Providers, such as pharmacies, do not pay for the Defendants' drugs based on the AWP, the inflated AWPs created a large discrepancy between the actual price paid by providers to acquire pharmaceuticals, and the reimbursements paid to these entities by Medicaid.

9.     This discrepancy between the drug's reported AWP and the actual price paid by providers was crafted by the Defendants and coined "the spread".

10.    The "spread" acts as an inducement to providers who distribute drugs. With a higher spread, the manufacturer induces providers to select the Defendants' drugs over other competing drugs.

11.    The Defendant manufacturers compete to provide the largest "spread" between what they secretly charge the providers and what they fraudulently represent they charged the providers, or the AWP.

12.    The greater the "spread" from what the Defendants actually charge the intermediary and what the Defendants fraudulently report they charge the provider, the more profit the provider makes from selling the drug.

13.     Because the provider makes a greater profit from a Defendant's drug with the largest spread, they then fill more prescriptions with that Defendant's drug, and thereby increase that Defendant's profit and market share.  This is known as "marketing the spread."

14.     The success of this tactic of "marketing the spread," is in part due to the fact that there are many similar and interchangeable drugs, and providers have the ability to choose the drug with which to fill a prescription.

15.     Based on investigation, information and belief, each Defendant named herein was involved in this aforesaid practice.

16.     The aforementioned conduct by each Defendant has resulted in inflated AWPs which cause the Medicaid program to overpay to purchase the Defendants' products.


## II.     JURISDICTION

17.     Subject matter jurisdiction exists in this Court pursuant to 28 U.S.C. § 1331, because this action alleges violations of federal laws 18 U.S.C. §1962 (c), and 42 U.S.C. §1396r-8.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) and (c) because each of the Defendants has done business and is qualified to do business within the District, and the events giving rise to the claims alleged in this Complaint, which damaged the Plaintiff, occurred within this District.

## III.   PARTIES

19.   Plaintiff is a municipal corporation organized under the laws of New York State. Orange County's principal place of business is 255 Main Street, Goshen, New York. As required by statute, Orange County pays 25 percent of Medicaid drug costs for its residents. New York Social Services Law § 367 et seq. In the 2005 calendar year, 49,941 of Orange County's 372,893 residents were eligible for Medicaid.

20.   Defendants are pharmaceutical companies engaged in the development, manufacture, marketing and/or sale of drugs. Each Defendant conducts significant business in Orange County, and at a minimum, sells its pharmaceuticals in Orange County. Accordingly, Orange County has paid and still is paying a false and inflated price for the cost of each of the Defendant's drugs.

21.   Defendant Abbott Laboratories ("Abbott") is an Illinois corporation with a principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois. Abbott is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Depakote® and Kaletra® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

22.   Defendant Alcon Laboratories, Inc. ("Alcon") is a Delaware corporation with a principal place of business located at 6201 South Freeway (TI-3), Fort Worth, Texas. Alcon is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Patanol® and Ciprodex® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

23.   Defendant Allergan, Inc. ("Allergan") is a Delaware corporation with a principal place of business located at 2525 Dupont Drive, Irvine, California. Allergan is chiefly engaged in

the development, manufacture, sale and/or marketing of pharmaceuticals such as Alphagan® and Lumigan® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

24.     Defendant Alpharma, Inc. ("Alpharma"), which includes its subsidiary Defendant Purepac Pharmaceutical Co., is a Delaware corporation with a principal place of business located at One Executive Drive, Fort Lee, New Jersey.  Alpharma is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Ibuprofen and Gabapentin which are sold throughout Orange County and for which Orange County paid a false and inflated price.

25.     Defendant Amgen, Inc. ("Amgen"), which includes its subsidiary Defendant Immunex Corporation,[1] is a Delaware corporation with a principal place of business located at One Amgen Drive, Thousand Oaks, California.   Amgen is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Neupogen® and Enbrel® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

26.     Defendant Apotex Inc. ("Apotex") is a Canadian corporation with a principal place of business located at 150 Signet Drive, Weston, Ontario M9L 1T9, Canada.  Apotex is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Paroxetine and Omeprazole which are sold throughout Orange County and for which Orange County paid a false and inflated price.

27.     Defendant Astellas Pharma US, Inc. ("Astellas") is a corporation with a principal place of business located at 3 Parkway North, Deerfield, Illinois.  Astellas is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Prograf® and

---

[1]     Immunex Corporation's principal place of business is 51 University Street, Seattle, Washington.

Protopic® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

28.    Defendant AstraZeneca Pharmaceuticals L.P. ("AstraZeneca"), which includes its subsidiary Defendant Zeneca Holdings Inc., is a Delaware limited partnership with a principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Seroquel® and Nexium® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

29.    Defendant Barr Laboratories, Inc. ("Barr") is a New York corporation with a principal place of business located at 2 Quaker Road, P.O. Box 2900, Pomona, New York. Barr is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Warfarin Sodium and Ciprofloxacin which are sold throughout Orange County and for which Orange County paid a false and inflated price.

30.    Defendant Berlex Laboratories, Inc. ("Berlex") is a Delaware corporation with a principal place of business located at 340 Changebridge Road, P.O. Box 1000, Montville, New Jersey. Berlex is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Betaseron® and Yasmin® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

31.    Defendant Boehringer Ingelheim Corporation ("Boehringer"), which includes its subsidiary Defendant Boehringer Ingelheim Pharmaceuticals Inc.,[4] is a Nevada corporation with a principal place of business located at 900 Ridgebury Rd., Ridgefield, Connecticut. Boehringer is

---

[4]    Boehringer Ingelheim Pharmaceuticals Inc. is a Connecticut Corporation.

chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Mobic® and Combivent® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

32.    Defendant Bristol-Myers Squibb Company ("Bristol-Myers"), which includes its subsidiary Defendant Oncology Therapeutics Corp.,[5] is a Delaware corporation with a principal place of business located at 345 Park Avenue, New York, New York.  Bristol-Myers is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Plavix® and Pravachol® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

33.    Defendant Dey Inc. ("Dey"), formerly Dey Laboratories ("Dey, L.P."), is a Delaware corporation with a principal place of business located at 2751 Napa Valley Corporate Drive, Napa, California.  Dey is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Duoneb® and EpiPen® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

34.    Defendant Eisai Inc. ("Eisai"), a United States Pharmaceutical subsidiary of Tokyo-based Eisai Co., Ltd., is a Delaware corporation with a principal place of business located at 500 Frank W. Burr Boulevard, Teaneck, New Jersey.  Eisai is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Aciphex® and Aricept® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

---

[5]    Oncology Therapeutics Corp.'s principal place of business is located at 395 Oyster Point Boulevard, Ste. 405, South San Francisco, California.

35.     Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with a principal place of business located at Lilly Corporate Center, Indianapolis, Indiana.  Eli Lilly is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Zyprexa® and Strattera® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

36.     Defendants Endo Pharmaceuticals Inc. ("Endo"), a subsidiary of Defendant Endo Pharmaceuticals Holdings Inc., is a Delaware corporation with a principal place of business located at 100 Painters Drive, Chadds Ford, Pennsylvania.  Endo is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Lidoderm® which is sold throughout Orange County and for which Orange County paid a false and inflated price.

37.     Defendant Forest Pharmaceuticals, Inc. ("Forest Pharm"), a subsidiary of Defendant Forest Laboratories, Inc., is a corporation headquartered in St. Louis, Missouri with a principal place of business located at 13600 Shoreline Drive, St. Louis, Missouri.  Forest Pharm is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Lexapro® and Celexa® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

38.     Defendant Genentech, Inc. ("Genentech") is a Delaware corporation with a principal place of business located at 1 DNA Way, South San Francisco, California.  Genentech is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Pulmozyme® and Rituxan® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

39.    Defendant Genzyme Corporation ("Genzyme") is a Massachusetts corporation with a principal place of business located at 500 Kendall Street, Cambridge, Massachusetts. Genzyme is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Cerezyme® and Renagel® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

40.    Defendant Gilead Sciences, Inc. ("Gilead") is a Delaware corporation with a principal place of business located at 333 Lakeside Drive, Foster City, California. Gilead is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Viread® and Truvada® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

41.    Defendant GlaxoSmithKline PLC ("GSK"), which includes its subsidiaries Defendant SmithKline Beecham Corp. and GlaxoWellCome, Inc.,* is an English corporation with a principal place of business located at 980 Great West Road, Brentford, Middlesex TW8 9GS England. GSK is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Advair® and Lamictal® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

42.    Defendant Hoffmann-La Roche Inc. ("Hoffmann-La Roche"), a subsidiary of Defendant Roche Laboratories Inc., is a corporation with a principal place of business located at 340 Kingsland Street, Nutley, New Jersey. Hoffmann-La Roche is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Pegasys® and Copegus® which are

---

*    SmithKline Beecham Corp. has a principal place of business located at One Franklin Plaza, 16th & race Streets, Philadelphia, Pennsylvania. GlaxoWellcome Inc. has a principal place of business at 5 Moore Drive, P.O. Box 13398, Research Triangle Park, North Carolina.

sold throughout Orange County and for which Orange County paid a false and inflated price.

43.     Defendant Ivax Pharmaceuticals Inc. ("Ivax"), a subsidiary of Defendant Teva Pharmaceutical Industries Ltd., is a Florida corporation with a principal place of business located at 4400 Biscayne Blvd., Miami, Florida. Ivax is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Clozapine and Metformin which are sold throughout Orange County and for which Orange County paid a false and inflated price.

44.     Defendant Johnson & Johnson Group ("J&J"), which includes its subsidiaries Defendants Janssen Pharmaceutica Products, L.P., McNeil PPC Inc., McNeil Consumer, Ortho-Biotech Products L.P., and Ortho-McNeil Pharmaceuticals, is a New Jersey corporation with a principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. J&J is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Risperdal® and Procrit® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

45.     Defendant King Pharmaceuticals, Inc. ("King"), which includes its subsidiary Defendant Monarch Pharmaceuticals Inc., is a Tennessee corporation with a principal place of business located at 501 5th Street, Bristol, Tennessee. King is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Altace® and Skelaxin® which are sold throughout Orange County and for which Orange County paid a false and inflated price. Monarch Pharmaceuticals is a subsidiary of King.

46.     Defendant MedImmune, Inc. ("MedImmune") is a Delaware corporation with a principal place of business located at 35 West Watkins Mill Road, Gaithersburg, Maryland. MedImmune is chiefly engaged in the development, manufacture, sale and/or marketing of

-11-

pharmaceuticals such as Synagis® which is sold throughout Orange County and for which Orange County paid a false and inflated price.

47.     Defendant Merck & Co. Inc. ("Merck") is a New Jersey corporation with a principal place of business located at One Merck Drive, Whitehouse Station, New Jersey.  Merck is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Singulair® and Zocor® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

48.     Defendant Mylan Laboratories, Inc. ("Mylan"), which includes its subsidiary Defendant Mylan Pharmaceuticals, Inc., is a Pennsylvania corporation with  a principal place of business located at 1500 Corporate Drive, Canonsburg, Pennsylvania.  Mylan is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Nifedipine and Omeprazole which are sold throughout Orange County and for which Orange County paid a false and inflated price.

49.     Defendant Novartis Pharmaceutical Corporation ("Novartis"), which includes subsidiaries Defendants Sandoz Inc., Geneva Pharmaceuticals, and Organon Pharmaceuticals USA, Inc.,[7] is a corporation with  a principal place of business located at One Health Plaza, East Hanover, New Jersey.  Novartis is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Trileptal® and Diovan® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

_____

[7]     Sandoz Inc. has a principle place of business located at 506 Carnegie Center, Suite 400, Princeton, New Jersey.  Geneva Pharmaceuticals was acquired by Sandoz.  Organon Pharma USA, Inc., has a principal place of business located at 56 Livingston Avenue, Roseland, New Jersey.

50.    Defendant Novo Nordisk Pharmaceuticals, Inc. ("Novo") is a corporation with a principal place of business located at 100 College Road West, Princeton, New Jersey. Novo is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Novoseven® and Novolog® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

51.    Defendant Otsuka America, Inc. ("Otsuka") is a corporation with a principal place of business located at One Embarcadero Center, San Francisco, California. Otsuka is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Abilify® and Pletal® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

52.    Defendant Proctor & Gamble Pharmaceuticals, Inc. ("Proctor & Gamble") is an Ohio corporation with a principal place of business located at Proctor Gamble Place, Cincinnati, Ohio. Proctor & Gamble is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Actonel® and Asacol® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

53.    Defendant Par Pharmaceutical Companies, Inc. ("Par"), which includes its subsidiary Defendant Par Pharmaceutical Inc., is a Delaware corporation with a principal place of business located at One Ram Ridge Road, Spring Valley, New York. Par is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Paroxetine and Fluoxetine which are sold throughout Orange County and for which Orange County paid a false and inflated price.

54.     Defendant Pfizer Inc. ("Pfizer"), which includes its subsidiaries Defendants Agouron Pharmaceuticals Inc., Greenstone Ltd., and Pharmacia & UpJohn Inc., is a Delware corporation with a principal place of business located at 235 East 42nd Street, New York, New York. Pfizer is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Lipitor® and Zoloft® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

55.     Defendant Purdue Pharma L.P. ("Purdue"), which includes its subsidiaries Defendants Purdue Frederick Company and Purdue Pharma Company, is a corporation with a principal place of business located at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut. Purdue is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Oxycontin® which is sold throughout Orange County and for which Orange County paid a false and inflated price.

56.     Defendant Ranbaxy Pharmaceuticals Inc. ("Ranbaxy") is a corporation with a principal place of business at 600 College Road East, Princeton, New Jersey. Ranbaxy is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Amoxicillin and Cefuroxime Axetil which are sold throughout Orange County and for which Orange County paid a false and inflated price.

57.     Defendant Sanofi-Aventis ("Sanofi"), which includes its subsidiaries Defendants Sanofi Synthelabo, Inc., Aventis Pharmaceuticals Inc., Dermik Laboratories Inc., Aventis Behring L.L.C., is a Delaware corporation with a principal place of business located at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey. Sanofi is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Ambien® and Lantus® which are

sold throughout Orange County and for which Orange County paid a false and inflated price.

58.     Defendant Schering-Plough Corporation ("Shering"), which includes its subsidiary Defendant Warrick Pharmaceuticals,[6] is a New Jersey corporation with a principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey. Schering is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Nasonex® and Rebetol® which are sold throughout Orange County and for which Orange County paid a false and inflated price. Warrick Pharmaceuticals Corporation is a subsidiary of Schering.

59.     Defendant Schwarz Pharma Holdings, Inc. ("Schwarz"), which includes its subsidiary Defendant Kremers Urban Development Company, is a Delaware corporation with a principal place of business located at 6140 West Executive Drive, Mequon, Wisconsin. Schwarz is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Omeprazole and Isosorbide which are sold throughout Orange County and for which Orange County paid a false and inflated price. Kremers Urban Development Co. is a subsidiary of Schwarz.

60.     Defendant Sepracor Inc. ("Sepracor") is a Delaware corporation with a principal place of business located at 84 Waterford Drive, Marlborough, Massachusetts. Sepracor is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Xopenex® and Lunesta® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

61.     Defendant Shire US Inc. ("Shire"), a subsidiary of Shire PLC of the United Kingdom, is a corporation with a principal place of business located at 725 Chesterbrook Boulevard,

---

[6]     Warrick Pharmaceuticals has a principal place of business located at 12125 Moya Blvd., Reno, Nevada.

Chesterbrook, Pennsylvania. Shire is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Adderall® and Carbatrol® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

62. Defendant Takeda Pharmaceuticals North America, Inc. ("Takeda"), a subsidiary of Defendant Takeda Pharmaceutical Co., Ltd of Japan, is a corporation  with a principal place of business located at 475 Half Day Road, Lincolnshire, Illinois.  Takeda is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Actos® which is sold throughout Orange County and for which Orange County paid a false and inflated price.

63. Defendant TAP Pharmaceutical Products Inc. ("TAP"), a subsidiary of Defendant TAP Pharmaceuticals, Inc., is a Delaware corporation  with a principal place of business located at 675 North Field Drive, Lake Forest, Illinois.  TAP is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Prevacid® which is sold throughout Orange County and for which Orange County paid a false and inflated price.

64. Defendant Taro Pharmaceuticals U.S.A. Inc. ("Taro"), a subsidiary of Defendant Taro Pharmaceutical Industries Ltd. of Israel, is a corporation with a principal place of business located at 3 Skyline Drive, Hawthorne, New York.  Taro is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Clotrimazole and Warfarin Sodium which are sold throughout Orange County and for which Orange County paid a false and inflated price.

65. Defendant Teva Pharmaceuticals Industries, Ltd ("Teva"), a subsidiary of Defendant Teva Pharmaceutical  Industries Ltd. of Israel, is an New Jersey corporation with a principal place of business located at 1090 Horsham Road, North Wales, Pennsylvania.  Teva is chiefly engaged in

-16-

the development, manufacture, sale and/or marketing of pharmaceuticals such as Oxycodone and Clonazepam which are sold throughout Orange County and for which Orange County paid a false and inflated price.

66.     Defendant Tyco Healthcare ("Tyco"), which includes its subsidiary Defendant Mallinckrodt Inc., is a corporation with a principal place of business located at 15 Hampshire Street, Mansfield, Massachusetts. Tyco is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Hydrocodone and Oxycodone which are sold throughout Orange County and for which Orange County paid a false and inflated price. Mallinckrodt Inc. is a subsidiary of Tyco.

67.     Defendant UCB Pharma, Inc. ("UCB"), a subsidiary of Defendant UCB, S.A. of Belgium, is a corporation with a principal place of business at 1950 Lake Park Drive, Smyrna, Georgia. UCB is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Keppra® and Metadate® which are sold throughout Orange County and for which Orange County paid a false and inflated price.

68.     Defendant Watson Pharmaceuticals, Inc. ("Watson"), a subsidiary of Defendant Watson Pharma Inc., is a Nevada corporation with a principal place of business located at 311 Bonnie Circle, Corona, California. Watson is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Nicotine and Hydrocodone which are sold throughout Orange County and for which Orange County paid a false and inflated price.

69.     Defendant Wyeth is a Delaware corporation with a principal place of business located at 5 Giralda Farms, Madison, New Jersey. Wyeth is chiefly engaged in the development, manufacture, sale and/or marketing of pharmaceuticals such as Effexor® and Protonix® which are

sold throughout Orange County and for which Orange County paid a false and inflated price.

## IV.   GENERAL ALLEGATIONS

### A.   MEDICAID STATUTORY SCHEME

70.   The Medicaid Program was established by Title XIX of the Federal Social Security Act ("the Act"), 42 U.S.C. §§ 1396 et seq., ("the Medicaid Program").  In New York, the Medicaid Program is jointly funded by the federal, state, and county governments and it is administered by both the state and the county.  Although participation in the Medicaid Program is voluntarily, once a state agrees to participate in the Medicaid Program it must comply with all federal statutory requirements of the Act.  N.Y. Social Services Law § 363 et seq.

71.   New York's federally approved Medicaid plan incorporates the use of local social service agencies ("agency or agencies"), such as Orange and New York's other counties, to pay half of the state's share of Medicaid drug costs, or 25% of the total cost for drugs covered by Medicaid.  N.Y. Social Services Law § 368-a.  As a payer of these costs, federal Medicaid law authorizes New York State and its agencies, such as Orange County, to recover the amount of any overcharge to the Medicaid program, including the federal government's share.  42 U.S.C. § 1396a(a)(25)(A) & (B); 42 U.S.C. § 1396b(d)(3)(A).

72.   Additionally, New York Social Services Law § 145-b(2), provides a cause of action to both New York State and its agencies for recovery of such damages, awarding treble damages for a Defendant's knowing overcharge to the Medicaid Program.  Any recovery is apportioned between the State and its agency, in this case, Orange County.  Id.

1.    New York Calculates Medicaid Drug Costs Based on AWP

73.    In New York, Medicaid pays providers, such as pharmacies, for the cost of drugs that are "self-administered," based on the average wholesale price or "AWP," for each drug. N.Y. Soc. Serv. L. §367-a(9). The use of a manufacturer's AWP as a benchmark for Medicaid reimbursement is a widely accepted practice by States and their agencies throughout the United States.

74.    Each drug sold in the United States is either: (1) a single-source brand drug (a brand name drug that has no generic equivalent); (2) an innovator multi-source brand drug (a brand name drug that has a generic equivalent); or (3) a generic (a non-innovator multi-source drug).

75.    Every prescription drug sold in the United States is assigned a formulary code, known as a National Drug Code ("NDC"). Each different dosage and packaging of a single drug receives its own NDC. NDCs are published by the Food and Drug Administration ("FDA") . In 2005, there were more than 56,000 NDCs covered by the Medicaid Program. Each manufacturer establishes a separate AWP for each drug with an NDC code.

76.    After the manufacturers establish an AWP for each NDC, they supply the AWPs for each drug to non-party publishing companies who, in turn, report the AWPs in printed and electronic media such as First Data Bank's Blue Book ("Blue Book"), Thomson's Redbook ("Redbook"), the American Druggist First Databank Annual Directory of Pharmaceuticals, and Medi-span's Master Drug Database (collectively the "publishers").

77.    In instances where the publishers do not receive an AWP from a manufacturer, they receive other pricing information which is converted into a reported AWP. Regardless, it is always the manufacturer who provides the pricing information. In turn, the Medicaid Program in New York,

-19-

and thereby, Orange County, detrimentally relies on the manufacturers' AWP in making all payments

for drugs.

78.     New York Social Services Law §367-a(9)(b) establishes the formula for Medicaid

payments and provides, in relevant part:

> (i) if the drug dispensed is a multiple source prescription drug for which an upper
> limit has been set by the federal centers for medicare and medicaid services, an
> amount equal to the specific upper limit set by such federal agency for the multiple
> source prescription drug, and
>
> (ii) if the drug dispensed is a multiple source prescription drug or a brand-name
> prescription drug for which no specific upper limit has been set by such federal
> agency, the lower of the estimated acquisition cost of such drug to pharmacies, or the
> dispensing pharmacy's usual and customary price charged to the general public. For
> sole and multiple source brand name drugs, estimated acquisition cost means the
> average wholesale price of a prescription drug based upon the package size dispensed
> from, as reported by the prescription drug pricing service used by the department, less
> thirteen and twenty-five hundredths of one percent thereof, and updated monthly by
> the department. For multiple source generic drugs, estimated acquisition cost means
> the lower of the average wholesale price of a prescription drug based on the package
> size dispensed from, as reported by the prescription drug pricing service used by the
> department, less twenty percent thereof, or the maximum acquisition cost, if any,
> established . . . . acquisition cost means the lower of the average wholesale price of
> a prescription drug based on the package size dispensed from, as reported by the
> prescription drug pricing service used by the department, less twelve percent thereof,
> or the maximum acquisition cost . . . ,

Id. (emphasis added).

79.     The Center for Medicare and Medicaid Services generally establishes federal upper

limits ("FULs") for generic drugs that have at least three suppliers. Paragraph (i) above provides the

formula for Medicaid's payment for a multiple-source drug where a FUL has been set.

80.     Section 367-a(9)(b)Paragraph (ii) above provides the formula for Medicaid's payment

where the drug is a brand-name drug for which no FUL is set. For these drugs, the "estimated

acquisition cost" ("EAC") is the amount for which Medicaid is responsible. As defined above, the

current EAC, for brand name drugs as of July 15, 2006, is the AWP minus 13.25%[9] and AWP minus 12 percent for generics. Accordingly, the AWP is the benchmark used to calculate all payments in the absence of a FUL.

81.     However, Defendant's scheme also undermines the FUL. FULs are defined as a reasonable dispensing fee[10] plus "an amount established by CMS that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size." 42 C.F.R. § 447.332.

82.     Because even the FUL is based on the "published price," the FUL can never be a true 150 percent discounted price. As such, even when Orange County is paying for a drug based on its FUL it is still paying an inflated and false price.

### 2.     Defendant's Manipulation of the Medicaid Rebate Program

83.     As a corollary to having its products covered by Medicaid, a drug manufacturer must execute a rebate agreement with the Secretary of Health and Human Services ("HHS"). 42 U.S.C. § 1396r-8. The secretary of Health and Human Services signs the agreement "on behalf of all the States". Pursuant to the rebate agreement, the manufacturer must offer Medicaid it's "best price," defined as "the lowest price available from the manufacturer during the rebate period to any

---

[9]     Until 2005, EAC was defined as AWP minus 12%. In 2003, the EAC was defined as AWP minus 10%.

[10]    The reasonable dispensing fee is set by the state. In New York the dispensing fee is $3.50 - $4.50. N.Y. Soc. Serv. L. § 367-a(9)(d).

wholesaler, actuarer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States," with special exceptions. 42 U.S.C. § 1396r-8(c)(1)(C)(i).

84.    A best price must account for "cash discounts, free goods that are contingent on any purchase requirement, volume discounts and rebates," but not prices that are "merely nominal in amount." 42 U.S.C. § 1396r-8(c)(1)(C)(ii).

85.    Manufacturers are required to report their best prices, along with their average manufacturer prices or "AMPs," to the Secretary of the Department of Health and Human Services ("HHS"). "Average manufacturer price" ("AMP") is defined as the average price paid by wholesalers for drugs distributed to the actual class of trade, net of customary prompt pay discounts. It is calculated based on actual sales and the drug manufacturers are required to report it to, Centers for Medicare & Medicaid Services ("CMS") quarterly in order to participate in the drug rebate program. Id. HHS is required to maintain confidentiality over this information. 42 U.S.C. § 1396r-8(b)(3)(A), (D).

86.    According to CMS, 550 drug companies participate in the rebate program.  On information and belief, each Defendant named herein, entered into a drug rebate agreement with the Secretary of Health and Human Services similar to the sample rebate agreement attached hereto at Exhibit B. Pursuant to this agreement, and among other promises, each manufacturer agreed to offer Medicaid its best price.

87.    The rebate agreement, signed by each Defendant herein, makes manufacturers aware that failure to knowingly report its best price on each drug to Medicaid is a violation of federal law. This violation carries a penalty:

-22-

Any manufacturer with an agreement under this section that knowingly provides false information is subject to a civil money penalty in an amount not to exceed $ 100,000 for each item of false information. Such civil money penalties are in addition to other penalties as may be prescribed by law.

42 U.S.C. § 1396r-8(b)(3)(C)(ii); accord Exhibit B at 7.

88. The above federal requirements are expressly incorporated by New York Social Services Law § 367-a(7)(d). New York law emphasizes that where a manufacturer has entered into a rebate agreement, reimbursement to the New York State Medicaid program shall be made according to the terms of that rebate agreement.

89. The Sample Rebate Agreement defines "State Medicaid Agency" to include the agency designated by the State to administer the Medicaid Program. Exhibit B at 5. The rebate agreements the manufacturers entered into with the Secretary of HHS were on behalf of all states, including New York.

90. Orange County is an administrator and payer of Medicaid benefits under New York's federally approved Medicaid plan and is responsible for a share of Medicaid reimbursements. As such, at all times relevant hereto, Orange County has dutifully fulfilled its obligation to pay its share of Medicaid reimbursements, entitling it to rebates where appropriate. Accordingly, Orange County is an intended third-party beneficiary of any rebate agreements made on behalf of New York State.

91. Because Orange County reasonably relied to its detriment on Defendants' AWPs and best price representations, it is entitled to recoup any monies it overpaid to the Defendants.

B.      Defendant DRUG MANUFACTURERS' FRAUDULENT CONDUCT

    1.      Reporting of False and Inflated AWPS

92.     At all times relevant to this Complaint, Defendant Drug Manufacturers knowingly provided false and inflated AWPs or WACS to the publishers.  Defendants provided this intentionally false and inflated information with the knowledge that it would be published and that Medicaid would rely upon it for calculation of reimbursement payments.

93.     In an April 2003 report, the US. Department of Health and Human Services Office of Inspector General ("HHS OIG") indicated:

> Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented; and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care requirements.
>
> The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer. In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customer who purchase the product for their own accounts and Thereafter bill the federal health care programs will be reimbursed. To the extent that a manufacturer controls the "spread," it controls its customer's profit.
>
> Average Wholesale Price (AWP) is the benchmark Often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. Unlike bona fide discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government). Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral or program business. In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP is one purpose is to manipulate the "spread" to induce customers to purchase its product.

In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process. Furthermore, manufacturers should review their marketing practices. The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute. Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product.

94.    Defendants' intention in reporting false and inflated prices was to create a "spread" between the actual price paid by providers or pharmacies and Medicaid. This "spread" is an illegal kickback to the provider to encourage the sale of the manufacturer's drug over other competing drugs. The practice by which drug manufacturers offer a price far lower than the price paid by Medicaid, as an illegal inducement to sell its products, is called "marketing the spread."

95.    Instances of marketing the spread have been well documented. For example, Martha McNeill, the head of Texas' Medicaid drug program, testified that when Texas cut Warrick's inhaler reimbursement from $16.79 to $6.26, Warrick's Medicaid market share for the inhaler dropped from 71% to 42% in less than 2 years.

96.    Investigations conducted by Congress and other federal entities have concluded that Defendants' reporting of intentionally false and inflated AWPs is rampant in the area of generic

drugs. This can be attributed to the increased competition among manufacturers for a market share

in this arena.

97.     In a letter to Defendant Abbott dated October 31, 2000, Congressman Fortney Stark

(California) wrote:

>       You should by now be aware of Congressional investigations revealing that
> [your company] has for many years reported and published inflated and misleading
> data and has engaged in other deceptive business practices. This letter is a call for
> your company to immediately cease overcharging taxpayers and jeopardizing public
> health ... .
>
>       The price manipulation scheme is executed through [your company's] inflated
> representations of average wholesale price (AWP) and direct price ("DP") which are
> utilized by the Medicare and Medicaid Programs in establishing drug reimbursements
> to providers. The difference between the inflated representations of AWP and DP
> versus the true price providers are paying, is regularly referred to in your 'industry
> as "the spread." The evidence amassed by Congress clearly shows that [your
> company] has intentionally reported inflated prices and has engaged in other
> improper business practices in order to cause its customers to receive windfall profits
> from Medicare and Medicaid when submitting claims for certain drugs. The
> evidence further reveals that [your company] manipulated prices for the express
> purpose of expanding sales and increasing market share of certain drugs. This was
> achieved by arranging financial benefits or inducements that influenced the decisions
> of health care providers submitting Medicare and Medicaid claims...
>
>       Based on the evidence collected, [your company] should make arrangements
> to compensate taxpayers for the financial injury caused to federally funded programs.
> Any refusal to accept responsibility will most certainly be indicative of the need for
> Congress to control drug prices. If we cannot rely upon drug companies to make
> honest and truthful representations about their prices, then Congress will be left with
> No alternative but to take decisive action to protect the public.

146 Cong. Rec. E2037-2039 (Extensions Rep. Starck) (Oct. 31, 2000).

98.     The investigation led by Congressman Stark concluded that Defendants employed a

number of financial inducements to stimulate the sales of their drugs at the expense of both Medicare

and Medicaid. Such inducements include the practices described herein, i.e., volume discounts,

off-invoice pricing and free goods designed to lower the net cost to the purchaser while keeping high

the cost of the drug to government programs:

> Some drug companies have also utilized a large array of other impermissible
> inducements to stimulate sales of their drugs. These inducements, including bogus
> "educational grants", volume discounts, rebates or free goods, were designed to result
> in a lower net cost to the purchaser while concealing the actual cost price beneath a
> high invoice price. A product invoiced at $100 for ten units of a drug item might
> really only cost the purchaser half that amount. Given, for instance, a subsequent
> shipment of an additional ten units at no charge, or a "grant", "Rebate" or "credit
> memo" in the amount of $50, the transaction would truly cost a net of only $5.00 per
> unit. Through all these "off invoice" means, drug purchasers were provided the
> substantial discounts that induced their patronage while maintaining the fiction of a
> higher invoice price-the price that corresponded to reported AWP's and inflated
> reimbursement...

146 Cong. Rec. E1623 (daily ed. Sept. 28, 2000).

99.     In the 2000 edition of the *RedBook*, Defendant Bristol-Myers reported an AWP of

$1,296.64 for one 20 mg/ml, 50 ml vial of Vepesid (Etoposide) for injection, while selling the exact

same drug in the same quantity to a group purchasing organization for $70. This represents a spread

between Bristol-Myers' falsely inflated AWP and the real price of $1,226.64. Id.

100.     Abbott's Amikacin, used to treat an infection to which HIV positive persons are

susceptible, had an AWP of $54.56. The actual best price was $6.75. Abbott's Vancomycin, an

antibiotic used to treat intestinal infections, had an AWP of $68.77 as of April 2000. DOJ adjusted

it to $8.14. 146 Cong. Rec. E2038 (daily ed. Oct. 31, 2000).

101.     In 2002, an HHS OIG report estimated that pharmacies' actual acquisition cost for

generic drugs was, at the low end, 65.93% below the reported AWP across the board in 1999. The

OIG estimated that as much as $470 million dollars nationwide could have been saved for the 200

generic drugs with the greatest amount of Medicaid reimbursement in 1999 if reimbursement had

been based on a greater percentage discount off AWP.

102.    Manufacturers of generic drugs are aware of the AWPs reported by their competitors and of the actual sales price of their generic competitors' products. That is why they manipulate their own AWPs to gain or maintain a competitive advantage in the market for their generic products. This results in what is called "leap frogging", which occurs when AWPs for a particular generic shoot upward as manufacturers formulate their spreads.

103.    Consequently, generic drugs have some of the highest spreads of any drugs, which can result in an AWP exceeding actual costs by of 50,000%. The Department of Justice ("DOJ") has found the following for some of the Defendants named herein:

| Defendant | Multi-Source Drug | RedBook AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Boehringer | Leucovorin Calcium | $ 164.40 | $ 2.76 | 6,581% |
| Bristol-Myers Group | Etoposide (Vepesid) | $136.49 | $ 34.30 | 298% |
| Dey | Albuterol Sulfate** | $ 30.25 | $ 9.17 | 230% |
| Immunex | Leucovorin Calcium | $137.94 | $14.58 | 846% |
| Watson | Vancomycin HCL | $ 70.00 | $ 3.84 | 1,567% |

104.    Defendants market the spread for brand-name, multi-source, and generic drugs alike. According to its most recent estimate, the OIG reports that while New York Medicaid pays the published AWP minus 12-13.25% depending on drug type, in 2005, estimated acquisition costs ("EACs") should have been much more. Specifically the OIG found the following to be more

accurate estimates:

| Actual Manufacturer Price v. Average Wholesale Price by Drug Category: AMP = AWP - X% | | | |
|---|---|---|---|
| | Median | Average | Weighted Average (by Medicaid expenditures) |
| Single Source Brands | 23% | 25% | 24% |
| Multisource Brands | 28% | 40% | 36% |
| Generics | 70% | 65% | 74% |

O.I.G. Rep. No. OEI-05-05-00240, at 11 (2005).

105. Currently, even though New York law provides for Orange County to pay AWP minus 13.25% for single and multi source brand name drugs, and AWP minus 12 % for generics, this is still much more than the price charged to providers.

106. As shown by the weighted averages, in paragraph 104 above, AWP fraud is most pronounced in the area of generic drugs. Because AWP is used as a benchmark for reimbursement, the manufacturers act together to elevate the AWP for all generic drugs, thereby causing Orange County to overpay.

107. The significance of the manufacturer's manipulation of AWP is clear. Knowing that Medicaid relies on AWP as the benchmark for reimbursement, each Defendant is aware that by establishing a higher AWP it can sell its product(s) for a lower price to providers and that by doing so, it would be creates an incentive for that provider to purchase its product(s).

108. In recent settlements entered into between two  major drug manufacturers and the United States Government the drug manufacturers acknowledge that this practice is taking place. In 2005, GlaxoSmithKline ("GSK") paid $140 million to settle allegations that it inflated prices for two of its drugs (Zofran and Kytril) sold to the public knowing that these prices would be used to

set reimbursement rates paid by Medicaid. GSK marketed the spread between their AWPs and the significantly lower actual cost to its providers. In 2004, Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals paid $27 million to settle allegations that it submitted false pricing information for its generic line of allergy and respiratory drugs resulting in inflated payments of Medicaid funds.

### 2.    Failure To Report Best Prices

109.    In addition, the drug manufacturers also exclude Orange County from the other inducements offered to providers to sell their drugs over competitors. These inducements further undercut the AWP and the best price set by the manufacturer. These inducements are offered to providers and other commercial buyers in the form of chargebacks, rebates, discounts, and free samples, and are typically unaccounted for in a manufacturer's AWP and best price.

110.    Chargebacks are used to compensate a wholesaler for its sale of a manufacturer's drug to an indirect purchaser at a steep discount. In a chargeback arrangement, a wholesaler purchases a large volume of a drug from the manufacturer and delivers the drug to an indirect purchaser such as a hospital, for a pre-negotiated steeply discounted price agreed to between the manufacturer and the hospital. The wholesaler then "charges back" the manufacturer for any difference between the negotiated price and wholesaler's costs.

111.    A rebate is typically offered to a wholesaler as a retrospective price concession for purchasing a large volume of drugs, while "prompt pay discounts," are routinely given when the purchaser pays the manufacturer within a specified period of time. Defendants also widely distribute free samples through their sales and marketing departments as a means of lowering the wholesaler's

price.

112.    These and other types of rebates, discounts, and promotions which amount to significant savings are routinely offered by the drug manufacturers to wholesalers, but not to Orange County.

113.    The manufacturers goal in providing these inducements is to increase the "spread" between the wholesaler's price and AWP.  The end result of marketing the spread is an increased demand for a Defendant's drug and, in turn, to increase the manufacturer Defendants' profits.

114.    One particular area where Defendants' focus on marketing the spread is distribution to Pharmacy Benefit Managers ("PBMs").  PBMs manage and administer prescription drug programs for HMOs, employer health plans, and health insurers.

115.    Because PBMs work with these entities to decide which prescription drugs will be included in their formularies, the lists or drugs that the plan uses to make reimbursement decisions about individual drugs, and in many cases, operate as mail-order pharmacies, Defendants have a keen interest in marketing the spread to PBMs.

116.    Eighty percent of the PBM market is controlled by three PBMs which include Advance PCS/Caremark, Express Scripts, and Medco Health.  These three PBMs are responsible for supplying the prescription drugs to an estimated 210 million people in the United States.

117.    There are two sides to the business operation of PBMs.  On one side, PBMs contract with pharmaceutical manufacturers, retail pharmacies, and health plans to decide which drugs should be included in formularies.  Formularies are the list of drugs that are available under a particular plan.  So for example, if a given plan needs a cholesterol lowering drug, it may select and only cover Lipitor and not Zocor, or *vice versa*.  PBMs also bill health plans for prescription drug payments on

behalf of plan participants, and pay the pharmacies. On the second side of the business operation, PBMs operate their own proprietary mail order pharmacies.

118.    Historically, PBMs existed solely to secure drugs for their health plan clients in exchange for administrative fees. However, this practice has changed in recent years and PBMs are increasingly taking advantage of the "spread" between pharmacy prices and what corporate and government clients pay.

119.    The Defendant manufacturers market the spread to PBMs in order to gain inclusion into a PBM's formulary for a healthcare plan. Since PBMs acquire pharmaceuticals well below AWP and are reimbursed by healthcare plans based on AWP, they too make their profit from an increased spread between the AWP and the acquisition price. The Defendants know this and intentionally inflate AWPs to make their drugs more profitable to PBMs so that they will be included on formularies.

120.    In effect, marketing the spread to PBMs is another way for the Defendants to defraud Medicaid. According to a February 2005 report by the U.S. Government Accountability Office ("GAO"):

> While CMS has acknowledged that not all PBM arrangements will effect best price and AMP, the agency has advised manufacturers that administrative fees, incentives, promotional fees and chargebacks, as well as all discounts and rebates provided to purchasers, should be considered in determinations of best price and AMP when they are associated with sales that are to be considered in those prices. When a PBM acts as a mail-order pharmacy and takes possession of drugs, it is a purchaser.

U.S. GAO, *Medicaid Drug Rebate Program, Inadequate Oversight Raises Concerns about Rebates Paid to States*, February 2005, GAO-05-102 at 16.

121.   As stated, when selecting drugs for their formularies, PBMs factor in the profits they will make.   They take into account the spread between actual price and AWP, as well as any discounts, rebates or chargebacks:

> When a PBM is considering adding to or deleting drugs from the formulary, it will negotiate with individual drug manufacturers about providing incentives since the inclusion or exclusion will ultimately mean large dollars to the manufacturer. Generally, these incentives constitute a manufacturer's rebate calculated as a percentage of the product that flows through the PBM to the plan. The rebate is often set in advance and based on the market share that a manufacturer expects to see for its product within a plan. As an example, assume that a manufacturer and PBM agree that sales of drug X for one year, at average manufacturer price (AMP), will be $5 million. Based on this, the manufacturer agrees to "rebate" back to the PBM 10 percent of the AMP for products dispensed though the particular plan represented by the PBM. The PBM would ultimately receive $500,000 from the manufacturer. The PBM, which is acting on behalf of a client such as a large employer, would receive some of this as a fee for services and the remainder remitted back to the client.

Office of Health Policy, *Issues In Prescription Drug Coverage, Pricing, Utilization, and Spending: What We Know and Need To Know*, HHS Office of Asst. Sec. For Policy and Evaluation, Appendix A §3.3 (Feb. 18, 2000).

122.   Recent settlements demonstrate the growing pervasiveness of marketing the spread to PBMs.   In August 2006, Schering-Plough, entered into a $255 million settlement with the Justice Department and the U.S. Attorney's Office in Massachusetts, to settle, among other charges, the allegation that the company induced managed care organizations to buy its products by providing free samples, clinical trial grants, and other inducements.   In 2004, Schering Sales Corporation, the sales and marketing division of Schering-Plough, pleaded guilty and paid a $52.5 million fine to resolve charges that it paid an HMO a kickback to keep Claritin on its formulary.

123.   The Defendants are aware that PBMs rely on the publishers for the AWPs of covered drugs.   Because Defendants set the AWPs they are able to manipulate the profits of providers and

PBMs in order to offer an incentive for the inclusion of their drugs in the formularies.

124.   Simultaneously, the Defendants are also aware that Medicaid payers, such as Orange County, rely on AWPs to determine reimbursement costs and that by failing to offer the same incentives to Medicaid they are causing Medicaid to grossly overpay for drugs it purchases.

### 3.   Failure To Pay Proper Rebates

125.   Upon execution of a rebate agreement, pursuant to 42 U.S.C. § 1396r-8, each Defendant is required to report its AMPs and best prices for each quarter. "Best price" is the term used for the lowest price available from the manufacturer to any wholesaler, provider, HMO, or non profit entity, with certain limited exceptions.  At all times referenced herein, Defendants were aware that Medicaid was to receive its lowest or best price for all covered drugs.

126.   Nonetheless, each Defendant intentionally calculated its best price without accounting for factors that it was statutorily required to include.  Additionally, each Defendant purposely failed to account for incentives they gave to providers such as chargebacks, rebates, discounts, and free samples, in calculating its best price.

127.   Thus, although federal and state Medicaid statutes require Defendants to provide rebates on a quarterly basis if they do not charge Medicaid the lowest or "best" price offered to any commercial customer, the Defendants have regularly failed to do so.  This failure to report and accurately determine best price has led to significant underpayment of rebates to Medicaid.

128.   Several recent settlements demonstrate the pervasiveness of this illegal practice.  In 2005, King Pharmaceuticals, a Defendant named herein, agreed to pay $124 million plus interest to resolve allegations that it underpaid rebates owed under the Medicaid program and overcharged

various federal and state government entities for its drug prices.

129.   In 2003, four major pharmaceutical companies, three of whom are Defendants herein, agreed to settle claims brought by the United States Government for their failures to report best prices and pay proper rebates. AstraZeneca pled guilty and agreed to pay $24.9 million as a part of a larger $355 million settlement for failing to pay proper rebates owed to states under the Medicaid Drug Rebate Program. Bayer Corporation paid more than $257 million in a global settlement of False Claims Act and criminal allegations that it evaded paying Medicaid rebates to states by operating a "lick and stick" drug re-labeling and discounting scheme. GlaxoSmithKline entered into a settlement for similar allegations, paying $87 million, and entering into a corporate integrity agreement ("CIA") providing that it must report its "best price" to the government in the future. Pfizer entered into a similar CIA and paid $49 million to resolve false claims stemming from its failure to report accurate "best prices" to Medicaid under its drug rebate agreements. The company was alleged to have retained over $20 million in rebates owed to Medicaid.

## V.   GOVERNMENT INVESTIGATIONS

130.   Over the past several years, the United States Department of Justice ("DOJ"), the United States Government Accountability Office ("GAO"), the Office of Inspector General at the United States Department of Health and Human Services ("OIG"), and various Congressmen and Congressional subcommittees have engaged in rigorous investigations of the Defendants and other pharmaceutical companies for their inflation of AWPs and other fraudulent practices.

131.    In January 2003, the U.S. General Accounting Office ("GAO")[11] placed Medicaid on its list of government programs at "High Risk" for fraud, waste, abuse or mismanagement. As a response to the fraud and abuse taking place in the Medicaid system, in March 2006, CMS announced the implementation of a new Medicaid Integrity Program ("MIP"). The MIP is a part of the 2005 Deficit Reduction Act and will require all entities participating in the Medicaid Program to enter into an agreement which will permit Medicaid to conduct periodic reviews and audits in an effort to identify and recover overpayments. One of the four key areas of concern to be addressed by the MIP is "the provision of prescription drugs to beneficiaries and the underlying costs of those drugs as reported to the States."

132.    Senator Grassley (R.-Ia.), Chairman of the Finance Committee, has long championed the effort to combat Defendants' fraudulent schemes. On October 31, 2005, he spoke in support of the Deficit Reduction Act, and described the magnitude of governmental investigations into the Defendants' pricing schemes:

> The Senate Finance Committee title helps preserve services to beneficiaries by ending overpayments to pharmacies, by reforming the broken system used to reimburse pharmacists for prescription drugs, which is based on the **flawed average wholesale price formula, costing taxpayers lots more money than it should. There have been 13 reports in the last 5 years dealing with an average wholesale price formula done by the Congressional Budget Office, the Inspector General's Office, and from the Government Accountability Office, all calling for reforming the Medicaid pharmacy payment formula and ending overpayment for prescription drugs. These overpayments have been costing the States, as well as our Federal Government, billions of dollars needlessly.**

151 Cong. Rec. S12069 (daily ed. Oct. 31, 2005) (statement of Sen. Grassley) (emphasis added).

---

[11]    In July 2004, the U.S. General Accounting Office was renamed the U.S. Government Accountability Office. As such the abbreviation "GAO" as used herein refers to the same entity.

133.   Previously, on March 16, 2005, Senator Grassley spoke in favor of Medicaid reform

in connection with Defendants' inflated AWPs:

> [T]he Medicaid drug payment system is in significant need of reform. The average wholesale price system clearly overpays for drugs. Just as we took the average wholesale price out of Medicare in the Medicare bill 2 years ago, it seems to me we can and must change this payment system in Medicaid.
>
> **AWP, average wholesale price, is a flawed system, and we all know it. AWP is more known today as "Ain't What's Paid," instead of what it really meant to say, "Average Wholesale Price."**
>
> Capturing savings by making this commonsense improvement is not inconsistent with a commission. While there is much that we can learn from a commission, we do not need a commission to tell us that the average wholesale price system of paying for drugs is flawed.
>
> **A recent General Accounting Office study showed that the best price system is also significantly flawed. If States are not getting the best price, it costs both the Federal Government and the State governments.**

151 Cong. Rec. S2816 (March 16, 2005) (statement of Sen. Grassley)(emphasis added).

134.   In the GAO Study referred to by Senator Grassley, the office looked at, among other

related issues, how manufacturers' determinations of best prices and AMPs impact Medicaid rebates.

The  GAO's findings support Plaintiff's allegations in this Complaint:

> We found considerable variation in the methods that manufacturers used to determine best price and AMP.  Manufacturers are allowed to make reasonable assumptions when determining best price and AMP, as long as those assumptions are consistent with the law and the rebate agreement.  The assumptions often pertain to the transactions, including discounts or other price reductions, that are considered in determining best price and AMP . . . **We found that manufacturers made varying assumptions about which sales to include and exclude from their calculations of AMP** . . . Manufacturers also differed in how they treated certain types of health care providers . . . For example, some manufacturers included sales to physicians groups in AMP, while others did not.  **These assumptions can effect the reported prices and, in turn, the size of rebates paid to states.**

*Medicaid Drug Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States*, U.S. G.A.O., Report to Congressional Requesters (February 2005)(emphasis added).

135.   Additionally, in two companion reports by the Office of Inspector General of the Department of Health and Human Services ("OIG"), done in June 2005, confirm Plaintiff's allegations:

> Average sales price is substantially lower than average wholesale price for drug codes in this review.  For 2,077 national drug codes, the median percentage difference between ASP and AWP is 49 percent.  Even when factoring in the discounted AWP most States use to calculate the estimated acquisition cost for Medicaid drugs, ASP is still substantially lower.

*Medicaid Drug Price Comparison: Average Sales Price To Average Wholesale Price*, Department of Health and Human Services, Office of Inspector General, OEI-03-05-00200 at ii (June 2005)(emphasis added).

136.   Through its investigation, the OIG also found that AMP is substantially lower than both AWP and WAC.  Specifically, the OIG found:

> For Medicaid-reimbursed drugs, the AMP is substantially lower than either of the published prices, namely, AWP and WAC.  The AMP is also lower than State estimates of pharmacy acquisition costs, which incorporate AWP and WAC.

> At the median, AMP is equal to AWP minus 59 percent; in contrast, States' median estimated acquisition cost formula is AWP minus 12 percent.  At the median of over 24,000 Medicaid-reimbursed NDCs, AMP is 59 percent lower that AWP.  To illustrate this 59 percent difference, for one NDC the AMP is $1.07 per pill, while the AWP is $2.61 per pill for the same drug.  The median AWP-based state EAC formula is AWP minus 12 percent.  This median State EAC formula would estimate pharmacy acquisition cost at $2.30 per pill for this same NDC.

> Forty-nine states estimate pharmacy acquisition cost using AWP minus a discount percentage.  However, even with a discount percentage, AMP is still lower than these States' estimates of pharmacy acquisition cost.  The AWP minus 12 percent is the median and is also the most common EAC formula based on AWP.

For 98 percent of Medicaid-reimbursed NDCs, the median State EAC formula based on AWP results in reimbursement amounts higher than AMP. In other words, AMP is less than AWP minus 12 percent for these NDCs. Conversely, for 2 percent of NDCs, the median State EAC formula would reimburse at a price below AMP.

*Medicaid Drug Price Comparison: Average Manufacturer Price To Published Prices*, Department of Health and Human Services, Office of Inspector General, OEI-05-05-00240 at 9 (June 2005) (emphasis added).

137.    On July 18, 2002, discussing how Defendants' pricing scheme impacts the Medicare program, Representative Stark (D-Ca.), condemned the drug manufacturers' manipulation of AWPs:

> Under current rules, medicare vastly overpays for these drugs, because it bases payments on the artificially high "average wholesale price" (AWP) reported by the drug's manufacturer—regardless of the actual price a provider pays for the drug. **There is abundant evidence that drug manufacturers have boosted their own drug sales and increased their profits, at great taxpayer expense, by manipulating the AWP of their drugs.** Simply put, drug manufacturers report inflated prices, sell providers the drugs for much less, and then encourage providers to bill Medicare for the maximum allowable amount—95 percent of the inflated AWP reported by the manufacturers . . . Drug manufacturers have resisted efforts to investigate this problem. For example, last summer the GAO continued its investigation into AWP on Congress' behalf and requested drug price information from many manufacturers. One pharmaceutical company, Pfizer, refused to comply with GAO's request until this January, when GAO subpoenaed the company's CEO, Henry McKinnell.

148 Cong. Rec. E1302 (July 18, 2002) (Extensions Rep. Stark)(emphasis added).

138.    Stark also wrote a letter to Miles White, Chief Executive Officer of Abbott Laboratories, a Defendant named herein, proclaiming Congress' findings with regard to AWP fraud:

> Dear Mr. White: You should by now be aware of **Congressional investigations revealing that Abbott has for many years reported and published inflated and misleading price data and has engaged in other deceptive business practices.** This letter is a call for your company to immediately cease overcharging taxpayers and jeopardizing the public health. The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price ("AWP") and

direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers. The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to in your industry as "the spread". The evidence amassed by Congress clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs. This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims.

147 Cong. Rec. E2038-9 (daily ed. Oct. 31, 2000)(emphasis added).

139.    Stark also wrote a letter to Alan F. Hohner, President, Pharmaceutical Research and

Manufacturers of America, expressing the following "shocking conclusions:"

> **First**--Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kick-back for their customers.
> **Second**--Certain drug manufacturers have routinely acted with impunity in arranging improper financial inducements for their physician and other healthcare provider customers.
> **Third**--Certain drug manufacturers engage in fraudulent price manipulation for the express purpose of causing federally funded healthcare programs to expend scarce tax dollars in order to arrange de facto kick-backs for the drug manufacturers' customers at a cost of billions of dollars.
> **Fourth**--Certain drug manufacturers arrange kick-backs to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive affect upon the physician/patient relationship and the exercise of independent medical judgement.
> **Fifth**--Certain drug manufacturers engage in illegal price manipulation in order to increase the utilization of their drugs beyond that which is necessary and appropriate based on the exercise of independent medical judgment not affected by improper financial incentives.

146 Cong. Rec. E1622 (Sept. 28, 2000) (Extensions Rep. Stark).

140.   Clearly, the U.S. Government has taken a strong interest in combating Defendants' illegal scheme.  The above-cited investigations verify Defendants' industry-wide scheme as alleged herein.

## VI.   ALLEGATIONS PARTICULAR TO THE COUNTY AND THE INDIVIDUAL Defendants

141.   The allegations below pertain to each Defendant and are examples of the unlawful conduct each has committed against Orange County.  These allegations underestimate the magnitude and pervasiveness of the Defendants' conduct.

142.   Details regarding each Defendant's pricing methods, actual prices offered to providers, discounting, rebates, and best price reporting are exclusively within the Defendants' control and will be sought within the discovery process.

143.   Based on the available information, Orange County alleges that each of Defendants' AWPs is false and inflated, and that as a result of relying on these fraudulent prices, it was subsequently overcharged for each drug.

144.   Orange County's data attached hereto as Exhibit A illustrates the charges incurred by the County between June 2002 and June 2006.  During this representative time period, Orange County paid over $171 Million for the Defendants drugs listed in Exhibit A.  It is believed that these overcharges extend back prior to June 2002 and continue to occur presently, therefore, Plaintiff does not limit the herein allegations to solely this time period.

145.   Upon information and belief, at all times relevant hereto, the Defendants also overcharged Orange County by failing to report proper best prices and pay proper rebates.  When

Defendants' failure to report best prices is factored in, the spread between the actual costs to providers and the AWPs used by Orange County will be even larger.

146.    Based on Orange County's available data and research it is believed that the following Defendants caused the greatest harm to the County through their fraudulent schemes:

### A.    Abbott

147.    At all times relevant hereto, Abbott routinely reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $6.4 million for Abbott's drugs.

148.    It is believed that, Abbott reported inflated average wholesale prices for various dosages of Depakote®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.    During the relevant time period, it is estimated that Orange County spent over $3,440,176.03 for Abbott's Depakote®.

149.    It is believed that, Abbott reported inflated average wholesale prices for Kaletra®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $671,691.01 for Abbott's Kaletra®.

150.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Abbott drugs since at least 2002.  Upon information and belief, Abbott has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

151.    When Abbott's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Abbott's

discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Abbott's control at this time and will be revealed through discovery.

152.    Further, at all times relevant herein, Abbott, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

153.    In connection with these fraudulent practices, Abbott has been investigated by several governmental authorities including: the United States Department of Justice[12] ("DOJ"), Congress, the Office of the Inspector General of the Department of Health and Human Services("OIG"), the Attorneys General of the States of California, Florida, Illinois, Ohio, Texas and Wisconsin, the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse, and the Commonwealth of Massachusetts.

154.    In July 2003, Abbott agreed to pay $622 million in exchange for settling allegations, raised by the U.S. Attorney's Office in the Southern District of Illinois, that its Ross Products Unit defrauded Medicaid and Medicare by its failure to report its best price.  A key subject of the investigation was whether the unit in question failed to include the kickbacks and other discounts given to providers when calculating its Best Price.

155.    Congressman Stark's October 31, 2000 letter, regarding fraudulent pricing practices was directed to Abbott's Chief Executive Officer, Miles White.  Stark's letter makes Abbott aware that Congress has "amassed" evidence of Abbott's intentional price inflation and that Abbott's conduct was "for the express purpose of expanding sales and increasing market share of certain

---

12.      A report published by HHS in 2000, documents the DOJ's finding that at least 51 examples of fraudulent AWPs for various dosages of 156 Abbott drugs, PM Rev. AB-00-86 (Sept. 8, 2009).

drugs."

156.   Abbott was also investigated by the House Committee on Energy and Commerce and Senate Finance Committee for its fraudulent pricing tactics.


### B.   Alcon

157.   At all times relevant hereto, Alcon routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $1 million for Alcon's prescription drugs.

158.   It is believed that, Alcon reported inflated average wholesale prices for Patinol®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $355,270.46 for Alcon's Patinol®.

159.   It is believed that, Alcon reported inflated average wholesale prices for Ciprodex®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $167,634.99 for Alcon's Ciprodex®

160.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Alcon drugs since at least 2002. Upon information and belief, Alcon has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

161.   When Alcon's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Alcon's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Alcon's control at this time and will be revealed through discovery.

-44-

162.    Further, at all times relevant herein, Alcon, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### C.    Allergan

163.    At all times relevant hereto, Allergan routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $633,435.52 for Allergan's prescription drugs.

164.    It is believed that, Allergan reported inflated average wholesale prices for Alphagan®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $108,521.71 for Allergan's Alphagan®.

165.    It is believed that, Allergan reported inflated average wholesale prices for Lumigan®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $95,578.36 for Allergan's Lumigan® .

166.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Allergan drugs since at least 2002. Upon information and belief, Allergan has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

167.    When Allergan's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Allergan's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Allergan's control at this time and will be revealed through discovery.

168.   Further, at all times relevant herein, Allergan, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### D.   Alpharma Defendants

169.   At all times relevant hereto, Alpharma routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $507,536.53 for Alpharma's prescription drugs.

170.   It is believed that, Alpharma reported inflated average wholesale prices for Ibuprofen, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $162,908.07 for Alpharma's Ibuprofen.

171.   It is believed that, Alpharma reported inflated average wholesale prices for Gabapentin, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $59,406.05 for Alpharma's Gabapentin.

172.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Alpharma drugs since at least 2002.   Upon information and belief, Alpharma has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

173.   When Alpharma's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding Alpharma's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within

Alpharma's control at this time and will be revealed through discovery.

174.    Further, at all times relevant herein, Alpharma, on behalf of the relevant Manufacturer- Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

175. Alpharma is under investigation by the House Committee of Energy and Commerce for its fraudulent pricing practices.   Alpharma's subsidiary, Purepac, was sued by the Massachusetts Attorney General.

### E.    Amgen Defendants

176.    At all times relevant hereto, Amgen routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $ 3.1 million for Amgen's prescription drugs.

177.    It is believed that, Amgen reported inflated average wholesale prices for Neupogen®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $1,394,379.97 for Amgen's Neupogen®.

178.    It is believed that, Amgen reported inflated average wholesale prices for Enbrel®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $933,493.19 for Amgen's Enbrel®,

179.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Amgen drugs since at least 2002. Upon information and belief, Amgen has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

180.    When Amgen's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding Amgen's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Amgen's control at this time and will be revealed through discovery.

181.    Further, at all times relevant herein, Amgen, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

182.    In its 2002 10-K filing, Amgen admitted that its profits are dependent on third-party payors such as Orange County Medicaid and thereby AWP inflation:

> Our sales depend on payment and reimbursement from third-party payors, and a reduction in the payment rate or reimbursement rate could result in decreased sales of our products.

183.    Amgen's fraudulent pricing practices have been investigated by the Senate Finance Committee, the DOJ, the OIG, and the Attorneys General of the States of Pennsylvania and Wisconsin.


### F.    Apotex

184.    At all times relevant hereto, Apotex routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $781,410.77 for Apotex's prescription drugs.

185.    It is believed that, Apotex reported inflated average wholesale prices for Paroxetine, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $426,239.15 on Apotex's Paroxetine.

Case 1:07-cv-02777-AKH   Document 1   Filed 04/05/07   Page 54 of 171

186. It is believed that, Apotex reported inflated average wholesale prices for Omeprazole, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $79,767.33 on Apotex's Omeprazole.

187. Orange County alleges that it has been overcharged for every drug listed in Exhibit A and possibly other Apotex drugs since at least 2002. Upon information and belief, Apotex has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

188. When Apotex's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Apotex's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Apotex's control at this time and will be revealed through discovery.

189. Further, at all times relevant herein, Apotex, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### G. Astellas

190. At all times relevant hereto, Astellas routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $630,580.15 for Astellas's prescription drugs.

191. It is believed that, Astellas reported inflated average wholesale prices for Prograf®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $376,210.26 on Astellas' Prograf®.

-49-

192.   It is believed that, Astellas reported inflated average wholesale prices for Protopic®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $251,788.27 on Astellas' Protopic®.

193.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and possibly other Astellas drugs since at least 2002.  Upon information and belief, Astellas has engaged in similar inflationary practices  in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

194.   When Astellas' failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Astellas's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Astellas' control at this time and will be revealed through discovery.

195.   Further, at all times relevant herein, Astellas, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### H.   AstraZeneca Defendants

196.   At all times relevant hereto, AstraZeneca routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $11.5  million for AstraZeneca's prescription drugs.

197.   It is believed that, AstraZeneca reported inflated average wholesale prices for Seroquel®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $4,797,531.53 on

AstraZeneca's Seroquel®.

198.   It is believed that, AstraZeneca reported inflated average wholesale prices for Nexium®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $472,373.96 on AstraZeneca's Nexium®.

199.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and possibly other AstraZeneca drugs since at least 2002. Upon information and belief, AstraZeneca has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

200.   When AstraZeneca's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding AstraZeneca's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within AstraZeneca's control at this time and will be revealed through discovery.

201.   Further, at all times relevant herein, AstraZeneca, on behalf of the relevant Manufacturer- Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

202.   Various governmental bodies, including Congress, the DOJ, the OIG, and the U.S. Food and Drug Administration have all investigated AstraZeneca's fraudulent pricing practices.

203.   In June 2003, AstraZeneca pled guilty and paid $291 million to settle charges alleging that it gave out thousands of free samples of Zoladex® to physicians knowing that they would charge their patients and insurance programs for the samples.

204.   In May 2003, AstraZeneca entered into a Corporate Integrity Agreement ("CIA") with the OIG to promote compliance with Medicaid and Medicare statutes and procedures. The terms of the CIA confirm AstraZeneca's practice of reporting fraudulent pricing information.

## L.   Barr

205.   At all times relevant herein, Barr routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $1 million for Barr's prescription drugs.

206.   It is believed that Barr reported inflated average wholesale prices for Warfarin Sodium, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $160,202.33 on Barr's Warfarin Sodium.

207.   It is believed that Barr reported inflated average wholesale prices for Ciprofloxacin, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $145,086.78 on Barr's Ciprofloxacin.

208.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Barr drugs since at least 2002. Upon information and belief, Barr has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

209.   When Barr's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Barr's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within

Barr's control at this time and will be revealed through discovery.

210. Further, at all times relevant herein, Barr, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

211. During the House Committee on Energy and Commerce's investigation of Barr's fraudulent pricing practices, on December 7, 2004, Barr's Senior Vice President of Sales and Marketing admitted that AWP does not reflect the actual selling price of its products.

212. In addition, Barr has been sued by the Massachusetts Attorney General in connection with its fraudulent pricing practices.

### J.    Berlex.

213. At all times relevant hereto, Berlex routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $546,515.28 for Berlex's prescription drugs.

214. It is believed that, Berlex reported inflated average wholesale prices for Betaseron®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $442,912.70 on Berlex's Betaseron®.

215. It is believed that, Berlex reported inflated average wholesale prices for Yasmin®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $61,232.00 on Berlex's Yasmin®.

216. Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Berlex drugs since at least 2002. Upon information and belief, Berlex has engaged in

similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

217. When Berlex's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Berlex's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Berlex's control at this time and will be revealed through discovery.

218. Further, at all times relevant herein, Berlex, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## K.    Boehringer Defendants

219. At all times relevant hereto, Boehringer routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $2.4 million for Boehringer's prescription drugs.

220. It is believed that, Boehringer reported inflated average wholesale prices for Mobic®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $647,046.16 on Boehringer's Mobic®.

221. Based on Orange County's investigation, Boehringer reported inflated average wholesale prices for Combivent®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $593,579.68 on Boehringer's Combivent®.

222. Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and possibly other Boehringer drugs since at least 2002. Upon information and belief, Boehringer has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

223. When Boehringer's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Boehringer's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Bristol-Myers's control at this time and will be revealed through discovery.

224. Further, at all times relevant herein, Boehringer, on behalf of the relevant Manufacturer- Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

225. Boehringer was investigated by the following governmental entities in connection with its fraudulent pricing: the DOJ, HHS, the OIG, Congress, and the Attorneys General of the States of Nevada, Pennsylvania and Wisconsin. The results of these investigations confirm Boehringer's fraudulent pricing practices.

226. During the House Committee of Energy and Commerce investigation of Boehringer's fraudulent pricing practices, on December 7, 2004, Boehringer's Senior Produce Manager of Roxane, Boehringer's subsidiary, admitted that AWP does not reflect the actual selling price of its products.

227. In a 2001 study, the DOJ confirmed Boehringer's inflationary pricing practices. The DOJ documents at least 32 examples where the published AWP for various dosages of nine Boehringer drugs were substantially higher that the actual prices. For example:

-55-

| Drug | Boehringer's 2001 RedBook Listed AWP | DOJ Determined Actual AWP | Monetary Spread | Percentage Spread |
|---|---|---|---|---|
| Acyclovir Sodium | $528.00 | $207.00 | $321.00 | 155% |
| Amikacin Sulfate | $437.50 | $65.53 | $372.17 | 570% |
| Mitomicyn | $128.05 | $51.83 | $76.22 | 147% |
| Cytarabine | $62.50 | $3.55 | $58.95 | 1,661% |
| Doxorubicin | $944.98 | $139.75 | $806.23 | 577% |
| Etoposide | $110.00 | $8.45 | $101.55 | 1,202% |
| Leucovorin Calcium | $184.40 | $2.76 | $181.64 | 6,581% |
| Methotrexate Sodium | $68.80 | $2.63 | $66.17 | 2,516% |
| Vinblastine Sulfate | $212.50 | $8.19 | $204.31 | 2,495% |

## L.    Bristol-Myers Defendants

228.    At all times relevant hereto, Bristol-Myers routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $5.4 million for Bristol-Myers's prescription drugs.

229.    It is believed that, Bristol-Myers reported inflated average wholesale prices for Plavix®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $1,621,652.18 on Bristol-Meyer's Plavix®.

230.    It is believed that, Bristol-Myers reported inflated average wholesale prices for Pravachol®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $790,235.88 on Bristol-Meyer's Pravachol®.

231.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and possibly other Bristol-Myers drugs since at least 2002. Upon information and belief, Bristol-Myers has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

232.    When Bristol-Myers's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Boehringer's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Boehringer's control at this time and will be revealed through discovery.

233.    Further, at all times relevant herein, Bristol-Myers, on behalf of the relevant Manufacturer- Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

234.    Bristol-Meyers was investigated by the following governmental entities in connection with its fraudulent pricing: Congress, the State of California's Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse, the Attorneys General of the States of Florida, Pennsylvania, Texas and Wisconsin. The results of these investigations confirm Bristol-Meyers fraudulent pricing practices.

235.    Particularly, Bristol-Meyers is under investigation by the House Committee of Energy and Commerce for its fraudulent pricing practices. For example, in a February 27, 2001, letter to

Bristol-Meyers, Representative Stark outlined specific of its illegal practices and noting that:

> The evidence clearly shows that Bristol has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Bristol manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs where the arranging of a financial benefit or inducement would influence the decisions of healthcare providers . . .

### M.    Dey

236.    At all times relevant hereto, Dey routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $581,295.12 for Dey's prescription drugs.

237.    It is believed that, Dey reported inflated average wholesale prices for Duoneb®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $261,541.23 on Dey's Duoneb®.

238.    It is believed that, Dey reported inflated average wholesale prices for EpiPen®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $91,106.04 on Dey's EpiPen®.

239.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Dey drugs since at least 2002. Upon information and belief, Dey has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

240.    When Dey's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Dey's discounting

and rebate activities, which affect the Best Prices for its drugs, are uniquely within Dey's control at this time and will be revealed through discovery.

241. Further, at all times relevant herein, Dey, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

242. Dey was investigated by the following governmental entities in connection with its fraudulent pricing: the DOJ, the OIG, the U.S. District Attorney for the District of Massachusetts, and the Attorneys General of the States of California, Connecticut, Minnesota, Montana, Ohio, Pennsylvania, Texas, West Virginia, and Wisconsin. The results of these investigations confirm Dey's fraudulent pricing practices.

243. During the House Committee on Energy and Commerce's investigation of Boehringer's fraudulent pricing practices, on December 7, 2004, Boehringer's Senior Vice President and CFO admitted that AWP does not reflect the actual selling price of its products.

244. Further, the Attorney General for the State of Connecticut documented significant spreads between Dey's published AWPs and the actual costs of many of its drugs.

### N.   Eisai

245. At all times relevant hereto, Eisai routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $1.4 million for Eisai's prescription drugs.

246. It is believed that, Eisai reported inflated average wholesale prices for Aciphex®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant

time period, it is estimated that Orange County spent over $899,673.74 on Eisai's Aciphex®.

247.    It is believed that, Eisai reported inflated average wholesale prices for Aricept®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $393,578.88 on Eisai's Aricept®.

248.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Eisai drugs since at least 2002.  Upon information and belief, Eisai has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

249.    When Eisai's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding Eisai's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Eisai's control at this time and will be revealed through discovery.

250.    Further, at all times relevant herein, Eisai, on behalf of the relevant Manufacturer-Publisher  Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

251.    Eisai's fraudulent pricing practices were the subject of an investigation by the Senate Finance Committee.

### O.    Eli Lilly

252.    At all times relevant hereto, Eli Lilly routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $9.8 million for Eli Lilly's prescription drugs.

253.   It is believed that, Eli Lilly reported inflated average wholesale prices for Zyprexa®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $7,058,006.30 on Eli Lilly's Zyprexa®.

254.   It is believed that, Eli Lilly reported inflated average wholesale prices for Strattera®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $40,171.48 on Eli Lilly's Strattera®.

255.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Eli Lilly drugs since at least 2002. Upon information and belief, Eli Lilly has engaged in similar inflationary practices  in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

256.   When Eli Lilly's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Eli Lilly's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Eli Lilly's control at this time and will be revealed through discovery.

257.   Further, at all times relevant herein, Eli Lilly, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

258.   Eli Lilly's fraudulent pricing practices were the subject of investigations by the House Committee on Energy and Finance and the U.S. Attorney's Office in Pennsylvania.

### P.    Endo Defendants

259.    At all times relevant hereto, Endo routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $1.8 million for Endo's prescription drugs.

260.    It is believed that, Endo reported inflated average wholesale prices for Lidoderm®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $1,078,792.55 on Endo's Lidoderm®.

261.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Endo drugs since at least 2002.  Upon information and belief, Endo has engaged in similar inflationary practices in   prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

262.    When Endo's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Endo's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Endo's control at this time and will be revealed through discovery.

263.    Further, at all times relevant herein, Endo, on behalf of the relevant Manufacturer-Publisher  Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### Q.    Forest Pharm Defendants

264.    At all times relevant hereto, Forest Pharm routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange

County paid over $1.7 million for Forest Pharm's prescription drugs.

265.    It is believed that, Forest Pharm reported inflated average wholesale prices for Lexapro®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $916,725.14 on Forest Pharm's Lexapro®.

266.    It is believed that, Forest Pharm reported inflated average wholesale prices for Celexa®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $541,715.75 on Forest Pharm's Celexa®.

267.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Forest Pharm drugs since at least 2002. Upon information and belief, Forest Pharm has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

268.    When Forest Pharm's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Forest Pharm's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Forest Pharm's control at this time and will be revealed through discovery.

269.    Further, at all times relevant herein, Forest Pharm, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

270.    Forest Pharm was investigated by the Senate Finance Committee and the OIG in connection with its fraudulent pricing practices.

### R.   Genentech

271.   At all times relevant hereto, Genentech routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid $714,452.89 for Genentech's prescription drugs.

272.   It is believed that, Genentech reported inflated average wholesale prices for Pulmozyme®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $200,204.56 on Genentech's Pulmozyme®.

273.   It is believed that, Genentech reported inflated average wholesale prices for Rituxan®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $196,078.07 on Genentech's Rituxan®.

274.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Genentech drugs since at least 2002. Upon information and belief, Genentech has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

275.   When Genentech's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Genentech's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Genentech's control at this time and will be revealed through discovery.

276.   Further, at all times relevant herein, Genentech, on behalf of the relevant Manufacturer- Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs

for its pharmaceutical products through direct communication with industry compendia.

### S.    Genzyme

277.    At all times relevant hereto, Genzyme routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $3.6 million for Genzyme's prescription drugs.

278.    It is believed that, Genzyme reported inflated average wholesale prices for Cerezyme®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $3,284,764.75 on Genzyme's Cerezyme®.

279.    It is believed that, Genzyme reported inflated average wholesale prices for Renagel®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $369,245.92 on Genzyme's Renagel®.

280.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Genzyme drugs since at least 2002.  Upon information and belief, Genzyme has engaged in similar inflationary practices  in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

281.    When Genzyme's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Genzyme's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Genzyme's control at this time and will be revealed through discovery.

282.   Further, at all times relevant herein, Genzyme, on behalf of the relevant Manufacturer- Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

**T.   Gilead**

283.   At all times relevant hereto, Gilead routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $802,413.49 for Gilead's prescription drugs.

284.   It is believed that, Gilead reported inflated average wholesale prices for Viread®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $500,896.15 on Gilead's Viread®.

285.   It is believed that, Gilead reported inflated average wholesale prices for Truvada®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $265,467.47 on Gilead's Truvada®.

286.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Gilead drugs since at least 2002. Upon information and belief, Gilead has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

287.   When Gilead's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Gilead's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Gilead's control at this time and will be revealed through discovery.

288.    At all times relevant herein, Gilead, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## U.    GSK Defendants

289.    At all times relevant hereto, GSK routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $15.9 million for GSK's prescription drugs.

290.    It is believed that, GSK reported inflated average wholesale prices for Advair®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $2,446,431.20 on GSK's Advair®.

291.    It is believed that, GSK reported inflated average wholesale prices for Lamictal®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $1,577,032.01 on GSK's Lamictal®.

292.    Orange County alleges that it has been overcharged overcharged for every drug listed in Exhibit A and other GSK drugs since at least 2002.  Upon information and belief, GSK has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

293.    When GSK's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding GSK's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within GSK's control at this time and will be revealed through discovery.

294. At all times relevant herein, GSK, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

295. GSK was investigated by the following governmental entities in connection with its fraudulent pricing practices: the DOJ, the OIG, the Attorneys General for the States of California, Colorado, Nevada, New York, Pennsylvania, Texas and Wisconsin. The results of these investigations confirm GSK's fraudulent pricing practices.

296. In 2003, GSK paid $87 million to settle allegations under the Federal False Claims Act that it repackaged and privately labeled Paxil® and Flonase®, for Kaiser at discounted prices, but failed to report these "best prices" to CMS.

297. In 2003, GSK also entered into a CIA to promote compliance with Medicaid and Medicare statutes and procedures.

298. Despite the presence of the CIA, GSK continues to engages in fraudulent pricing practices. For example, in August 2006, in conjunction with a larger settlement with the DOJ, GSK agreed to pay New York State $1.53 million in restitution for inflating the prices of two cancer drugs Zofran® and Amoxcil®.

299. GSK's pricing practices are under investigation by both the House Committee on Energy and Commerce and the Senate Finance Committee.

## V. Hoffmann-La Roche Defendants

300. At all times relevant hereto, Hoffmann-La Roche routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange

County paid over $2.3 million for Hoffmann-La Roche's prescription drugs.

301.    It is believed that, Hoffmann-La Roche reported inflated average wholesale prices for Pegasys®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $756,271.14 on Hoffman-La Roche's Pegasys®.

302.    It is believed that, Hoffmann-La Roche reported inflated average wholesale prices for Copegus® , as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $347,483.32 on Hoffman-La Roche's Copegus® .

303.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Hoffmann-La Roche drugs since at least 2002. Upon information and belief, Hoffmann-La Roche has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

304.    When Hoffmann-La Roche's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Hoffmann-La Roche's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Hoffmann-La Roche's control at this time and will be revealed through discovery.

305.    At all times relevant herein, Hoffmann-La Roche, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

306. Hoffman-La Roche is under investigation by both the Senate Finance Committee and the House

Committee on Energy and Commerce for its fraudulent pricing practices.

### W.   Ivax

307.   At all times relevant hereto, Ivax routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $2.2 million for Ivax's prescription drugs.

308.   It is believed that, Ivax reported inflated average wholesale prices for Clozapine, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $383,796.27 on Ivax's Clozapine.

309.   It is believed that, Ivax reported inflated average wholesale prices for Metformin, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $203,087.89 on Ivax's Metformin.

310. Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Ivax drugs since at least 2002. Upon information and belief, Ivax has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

311.   When Ivax's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Ivax's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Ivax's control at this time and will be revealed through discovery.

312.   At all times relevant herein, Ivax, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical

products through direct communication with industry compendia.

313.    Ivax is under investigation by the Commonwealth of Massachusetts, the Senate Finance Committee and the House Committee on Energy and Commerce for its fraudulent pricing practices.

## X.    Johnson & Johnson Defendants

314.    At all times relevant hereto, Johnson & Johnson Defendants routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $17.4 million for Johnson & Johnson's prescription drugs.

315.    It is believed that, Johnson & Johnson Defendants reported inflated average wholesale prices for Janssen's Risperdal®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $7,878,653.47 on Janssen Risperdal®.

316.    It is believed that, Johnson & Johnson Defendants reported inflated average wholesale prices for Ortho Procrit®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $3,371,223.90 on Ortho Procrit®.

317.    A 2001 GAO report documents a fraudulent AWP for Epoetin Alpha, sold by Johnson & Johnson as Procrit®.

318.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Johnson & Johnson Defendants drugs since at least 2002. Upon information and belief, Johnson & Johnson Defendants has engaged in similar inflationary practices in prior and subsequent

years resulting in comparable damage to Orange County for all covered drugs.

319.   When Johnson & Johnson Defendants's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Johnson & Johnson Defendants's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Johnson & Johnson Defendants's control at this time and will be revealed through discovery.

320.   At all times relevant herein, Johnson & Johnson Defendants, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

321.   Johnson & Johnson is under investigation by the Senate Finance Committee and the House Committee on Energy and Commerce for its fraudulent pricing practices.

## Y.   King Defendants

322.   At all times relevant hereto, King routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $1.1 million for King's prescription drugs.

323.   It is believed that, King reported inflated average wholesale prices for Altace®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $545,714.89 on Monarch's Altace®.

324.   It is believed that, King reported inflated average wholesale prices for Skelaxin®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $283,588.20 on Monarch's Skelaxin®.

325.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other King drugs since at least 2002.  Upon information and belief, King has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

326.    King's failure to report Best Price for its drugs is factored in, the spread  between reported AWP and true AWP will be even greater.  The facts surrounding King's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within King's control at this time and will be revealed through discovery.

327.    At all times relevant herein, King, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

328.    In November 2005, King agreed to pay $124 million to resolve charges that from 1994-2002 it underpaid rebates owed to the medicaid program and overcharged various federal and state entities, including New York.

### Z.    MedImmune

329.    At all times relevant hereto, MedImmune routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $3 million for MedImmune's prescription drugs.

330.    It is believed that, MedImmune reported inflated average wholesale prices for Synagis®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $2,700,051.52 on

MedImmune's Synagis®.

331.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other MedImmune drugs since at least 2002.   Upon information and belief, MedImmune has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

332.   When MedImmune's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding MedImmune's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within MedImmune's control at this time and will be revealed through discovery.

333.   At all times relevant herein, MedImmune, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### AA.   Merck

334.   At all times relevant hereto, Merck routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.   From 2002-2006 Orange County paid over $6.6 million for Merck's prescription drugs.

335.   It is believed that, Merck reported inflated average wholesale prices for Singulair®, as shown in Exhibit A resulting in a significant overcharge to Orange County.   During the relevant time period, it is estimated that Orange County spent over $2,104,736.61 on Singulair®.

336.   It is believed that, Merck reported inflated average wholesale prices for Zocor®, as shown in Exhibit A resulting in a significant overcharge to Orange County.   During the relevant time

period, it is estimated that Orange County spent over $1,745,226.52 on Zocor®.

337.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Merck drugs since at least 2002.   Upon information and belief, Merck has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

338.   When Merck's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding Merck's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Merck's control at this time and will be revealed through discovery.

339.   At all times relevant herein, Merck, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

340.   Merck's fraudulent pricing practices were investigated by the Senate Finance Committee, the DOJ, and the Attorney General of Texas.

## BB.   Mylan

341.   At all times relevant hereto, Mylan routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.   From 2002–2006 Orange County paid over $2.4 million for Mylan's prescription drugs.

342.   It is believed that, Mylan reported inflated average wholesale prices for Nifedipine, as shown in Exhibit A, resulting in a significant overcharge to Orange County.   During the relevant time period, it is estimated that Orange County spent over $221,464.84 on Mylan's Nifedipine.

343.    It is believed that Mylan reported inflated average wholesale prices for Omeprazole, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $192,475.59 on Mylan's Omeprazole.

344.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Mylan drugs since at least 2002.   Upon information and belief, Mylan has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

345.    When Mylan's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Mylan's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Mylan's control at this time and will be revealed through discovery.

346.    At all times relevant herein, Mylan, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

347.    Mylan was investigated by the House Committee on Energy and Commerce and the Commonwealth of Massachusetts in connection with its fraudulent pricing practices.

348.    In February 2001, Mylan agreed to pay $100 million to settle charges of price inflation on two of its generic anti-anxiety drugs - Clorazapate and Lorazapem. New York State received $2.1 million as reimbursement to its Medicaid program.

## CC.   Novartis Defendants

349.   At all times relevant hereto, Novartis routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $6.9 million for Novartis' prescription drugs.

350.   It is believed that, Novartis reported inflated average wholesale prices for Trileptal®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $708,127.41 on Novartis' Trileptal®.

351.   It is believed that, Novartis reported inflated average wholesale prices for Diovan®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $874,763.31 on Novartis' Diovan®.

352.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Novartis drugs since at least 2002.   Upon information and belief, Novartis has engaged in similar inflationary practices  in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

353.   When Novartis's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Novartis's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Novartis's control at this time and will be revealed through discovery.

354.   At all times relevant herein, Novartis, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

355.    Novartis was investigated by the House Committee on Energy and Commerce and the OIG in connection with its fraudulent pricing practices.


### DD.    Novo

356.    At all times relevant hereto, Novo routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $1.8 million for Novo's prescription drugs.

357.    It is believed that, Novo reported inflated average wholesale prices for Novoseven®, as shown in Exhibit A resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $1,524,934.00 on Novo's Novoseven®.

358.    It is believed that, Novo reported inflated average wholesale prices for Novolog®, as shown in Exhibit A resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $199,925.32 on Novo's Novolog®.

359.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Novo drugs since at least 2002. Upon information and belief, Novo has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

360.    When Novo's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Novo's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Novo's control at this time and will be revealed through discovery.

361.   At all times relevant herein, Novo, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### EE.   Otsuka

362.   At all times relevant hereto, Otsuka routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $3 million for Otsuka's prescription drugs.

363.   It is believed that, Otsuka reported inflated average wholesale prices for Abilify®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $2,967,435.72 on Otsuka's Abilify®.

364.   Based on Orange County's investigation, Otsuka reported inflated average wholesale prices for Pletal®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $67,018.70 on Otsuka's Pletal®.

365.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Otsuka drugs since at least 2002.   Upon information and belief, Otsuka has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

366.   When Otsuka's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding Otsuka's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within

Otsuka's control at this time and will be revealed through discovery.

367.    At all times relevant herein, Otsuka, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## FF.    Proctor & Gamble

368.    At all times relevant hereto, Proctor & Gamble routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid $533,238.70 for Proctor & Gamble's prescription drugs.

369.    It is believed that, Proctor & Gamble reported inflated average wholesale prices for Actonel®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $266,249.38 on Proctor & Gamble's Actonel®.

370.    It is believed that, Proctor & Gamble reported inflated average wholesale prices for Asacol®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $207,001.95 on Proctor & Gamble's Asacol®.

371.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Proctor & Gamble drugs since at least 2002.   Upon information and belief, Proctor & Gamble has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

372.    Even these investigations do not reveal the full impact of Proctor & Gamble's fraud because they do not include Proctor & Gamble's failures to report Best Price as required by federal and state rebate statutes. The full impact of these failures on Orange County's overcharges will be revealed through discovery of Proctor & Gamble's promotional, discounting and pricing practices.

373.    When Proctor & Gamble's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Proctor & Gamble's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Proctor & Gamble's control at this time and will be revealed through discovery.

374.    At all times relevant herein, Proctor & Gamble, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## GG.    Par Defendants

375.    At all times relevant hereto, Par routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $1.4 million for Par's prescription drugs.

376.    It is believed that, Par reported inflated average wholesale prices for Paroxetine, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $218,981.09 on Par's Paroxetine.

377.    It is believed that, Par reported inflated average wholesale prices for Fluoxetine, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $214,305.13 on Par's Fluoxetine.

378. Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Par drugs since at least 2002. Upon information and belief, Par has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

379. When Par's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Par's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Par's control at this time and will be revealed through discovery.

380. At all times relevant herein, Par, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

381. Par was investigated by the House Committee on Energy and Commerce and the Commonwealth of Massachusetts in connection with its fraudulent pricing practices.


### HH.   Pfizer Group

382. At all times relevant hereto, Pfizer routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $19.4 million for Pfizer's prescription drugs.

383. It is believed that, Pfizer reported inflated average wholesale prices for Lipitor®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $3,557,490.25 on Pfizer's Lipitor®.

384.    It is believed that, Pfizer reported inflated average wholesale prices for Zoloft® , as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $2,530,560.22 on Pfizer's Zoloft®.

385.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Pfizer drugs since at least 2002.  Upon information and belief, Pfizer has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

386.    When Pfizer's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Pfizer's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Pfizer's control at this time and will be revealed through discovery.

387.    At all times relevant herein, Pfizer, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

388.    Pfizer was investigated by the OIG, the Senate Finance Committee, and the House Committee on Energy and Commerce.

## II.    Purdue Defendants

389.    At all times relevant hereto, Purdue routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid $984,568.27 for Purdue's prescription drugs.

390.    It is believed that, Purdue reported inflated average wholesale prices for Oxycontin®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $981,150.41 on Purdue's Oxycontin®.

391.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Purdue drugs since at least 2002. Upon information and belief, Purdue has engaged in similar inflationary practices in  prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

392,    When Purdue's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Purdue's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Purdue's control at this time and will be revealed through discovery.

393.    At all times relevant herein, Purdue, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## JJ.    Ranbaxy

394.    At all times relevant hereto, Ranbaxy routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $1.2 million for Ranbaxy's prescription drugs.

395.    It is believed that, Ranbaxy reported inflated average wholesale prices for Amoxicillin, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $277,208.19 on Ranbaxy's

Amoxicillin.

396.    It is believed that Ranbaxy reported inflated average wholesale prices for Cefuroxime Axetil as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $114,104.68 on Ranbaxy's Cefuroxime Axetil.

397.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Ranbaxy drugs since at least 2002.  Upon information and belief, Ranbaxy has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

398.    When Ranbaxy's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Ranbaxy's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Ranbaxy's control at this time and will be revealed through discovery.

399.    At all times relevant herein, Ranbaxy, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.


### KK.    Sanofi-Aventis Defendants

400.    At all times relevant hereto, Sanofi routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $5.1 million for Sanofi's prescription drugs.

401.    It is believed that, Sanofi reported inflated average wholesale prices for Ambien®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $1,733,879.98 on Sanofi's Ambien®.

402.    It is believed that, Sanofi reported inflated average wholesale prices for Lantus®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $532,564.21 on Sanofi's Lantus®.

403.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Sanofi drugs since at least 2002. Upon information and belief, Sanofi has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

404.    When Sanofi's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Sanofi's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Sanofi's control at this time and will be revealed through discovery.

405.    At all times relevant herein, Sanofi, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

406.    Sanofi was investigated by the Senate Finance Committee in connection with its fraudulent pricing practices.

## LL.   Schering Defendants.

407.   At all times relevant hereto, Schering routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $3.8 million for Schering's prescription drugs.

408.   It is believed that, Schering reported inflated average wholesale prices for Nasonex®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $550,679.30 on Schering's Nasonex®.

409.   It is believed that, Schering reported inflated average wholesale prices for Rebetol®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $576,537.35 on Schering's Rebetol®.

410.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A, and other Schering drugs since at least 2002.  Upon information and belief, Schering has engaged in similar inflationary practices  in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

411.   When Schering's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Schering's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Schering's control at this time and will be revealed through discovery.

412.   At all times relevant herein, Schering, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

413.    In August 2006, Schering agreed to pay $435 million and plead guilty to a conspiracy charge to settle an investigation into its sales, marketing, and clinical trials launched by the U.S. DOJ and the U.S. Attorney's Office for Massachusetts. A key topic of the investigation was Schering's use of free samples and other enticements in order to induce managed care organizations and physicians to buy its products.

414.    In July 2004, Schering agreed to pay $350 million and plead guilty to criminal charges that it defrauded Medicaid. This settlement came as a result of a six-year investigation triggered by whistleblowers who accused Schering of selling its products to private providers for much less that it sold them to Medicaid.

415.    In April 2004, Schering agreed to pay $27 million to settle charges brought by the Texas Attorney General, which alleged that Schering, along with its subsidiary Warrick, defrauded the State of Texas by creating a false and inflated spread on the cost of Albuterol.

416.    Both Schering and Warrick were investigated by the House Committee on Energy and Finance, the Senate Finance Committee, and the Attorneys General of the States of California, Massachusetts, Minnesota, Montana, Ohio, Pennsylvania, and Wisconsin.


## MM.   Schwarz Defendants

417.    At all times relevant hereto, Schwarz routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $624,594.99 for Schwarz's prescription drugs.

418.    It is believed that, Schwarz reported inflated average wholesale prices for Omeprazole, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During

the relevant time period, it is estimated that Orange County spent over $422,689.45 on Schwarz's Omeprazole.

419. It is believed that, Schwarz reported inflated average wholesale prices for Isosorbide, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $57,360.89 on Schwarz's Isosorbide.

420. Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Schwarz drugs since at least 2002. Upon information and belief, Schwarz has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

421. When Schwarz's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Schwarz's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Schwarz's control at this time and will be revealed through discovery.

422. At all times relevant herein, Schwarz, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### NN.    Sepracor

423. At all times relevant hereto, Sepracor routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $687,263.39 for Sepracor's prescription drugs.

424.    It is believed that, Sepracor reported inflated average wholesale prices for Xopenex®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $557,413.78 on Sepracor's Xopenex®.

425.    It is believed that, Sepracor reported inflated average wholesale prices for Lunesta®, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $129,849.61 on Sepracor's Lunesta®.

426.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Sepracor drugs since at least 2002. Upon information and belief, Sepracor has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

427.    When Sepracor's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Sepracor's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Sepracor's control at this time and will be revealed through discovery.

428.    At all times relevant herein, Sepracor, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.


OO.    Shire

429.    At all times relevant hereto, Shire routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $788,856.88 for Shire's prescription drugs.

430.    It is believed that, Shire reported inflated average wholesale prices for Adderall®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $244,398.62 on Shire's Adderall®.

431.    It is believed that, Shire reported inflated average wholesale prices for Carbatrol® as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $126,998.48 on Shire's Carbatrol®.

432.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Shire drugs since at least 2002.  Upon information and belief, Shire has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

433.    When Shire's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Shire's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Shire's control at this time and will be revealed through discovery.

434.    At all times relevant herein, Shire, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.


**PP.    Takeda Defendants**

435.    At all times relevant hereto, Takeda routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $1.3 million for Takeda's prescription drugs.

436.     It is believed that, Takeda reported inflated average wholesale prices for Actos®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $1,334,777.71 on Takeda's Actos®.

437.     Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Takeda drugs since at least 2002.  Upon information and belief, Takeda has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

438.     When Takeda's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Takeda's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Takeda's control at this time and will be revealed through discovery.

439.     At all times relevant herein, Takeda, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## QQ.   TAP Defendants

440.     At all times relevant hereto, TAP routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $3.9 million for TAP's prescription drugs.

441.     It is believed that, TAP reported inflated average wholesale prices for Prevacid®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $3,560,754.94 on TAP's Prevacid®.

442.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other TAP drugs since at least 2002. Upon information and belief, TAP has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

443.    When TAP's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding TAP's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within TAP's control at this time and will be revealed through discovery.

444.    At all times relevant herein, TAP, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

445.    In October 2001, TAP agreed to pay $875 million to resolve criminal charges and civil liabilities in connection with its fraudulent pricing practices for the drug Lupron®. Nearly $600 million of this settlement was for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes.

446.    TAP also agreed to comply with a Corporate Integrity Agreement that mandates it comply with Medicaid and Medicare statutes and procedures.

447.    During a December 6, 2001, hearing on the above-mentioned criminal charges, U.S. District Court Judge William G. Young called TAP's conduct a "gross abuse to the Medicare/Medicaid repayment system ..." See U.S. v. TAP Pharm. Prods. Inc., No. CR-01-10354-WGY (D. Mass. December 6, 2001).

448.    TAP was investigated by the Senate Finance Committee and the Attorneys General of the States of Pennsylvania and Wisconsin in connection with its fraudulent pricing practices.

## RR.    Taro Defendants

449.    At all times relevant hereto, Taro routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $783,704.48 for Taro's prescription drugs.

450.    It is believed that, Taro reported inflated average wholesale prices for Clotrimazole, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $154,124.35 on Taro's Clotrimazole.

451.    It is believed that, Taro reported inflated average wholesale prices for Warfarin Sodium, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $95,071.27 on Taro's Warfarin Sodium.

452.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Taro drugs since at least 2002. Upon information and belief, Taro has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

453.    When Taro's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Taro's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Taro's control at this time and will be revealed through discovery.

454.    At all times relevant herein, Taro, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and act, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

### SS.    Teva Defendants

455.    At all times relevant hereto, Teva routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $4.4 million for Teva's prescription drugs.

456.    It is believed that, Teva reported inflated average wholesale prices for Oxycodone, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $172,432.49 on Teva's Oxycodone.

457.    It is believed that, Teva reported inflated average wholesale prices for Clonazepam, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $175,676.43 on Teva's Clonazepam.

458.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Teva drugs since at least 2002. Upon information and belief, Teva has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

459.    When Teva's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Teva's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Teva's control at this time and will be revealed through discovery.

460. At all times relevant herein, Teva, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

461. Teva's fraudulent pricing practices were investigated by the House Committee on Energy and Commerce.

## TT.   Tyco Defendants.

462. At all times relevant hereto, Tyco routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid $825,613.93 for Tyco's prescription drugs.

463. It is believed that, Tyco reported inflated average wholesale prices for Hydrocodone, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $457,320.98 on Tyco's Hydrocodone.

464. It is believed that, Tyco reported inflated average wholesale prices for Oxycodone, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $73,195.39 on Tyco's Oxycodone.

465. Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Tyco drugs since at least 2002. Upon information and belief, Tyco has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

466. When Tyco's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Tyco's

discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Tyco's control at this time and will be revealed through discovery.

467.    At all times relevant herein, Tyco, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## UU.    UCB Defendants

468.    At all times relevant hereto, UCB routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid $723,485.89 for UCB's prescription drugs.

469.    It is believed that, UCB reported inflated average wholesale prices for Keppra®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $593,142.28 on UCB's Keppra®.

470.    It is believed that, UCB reported inflated average wholesale prices for Metadate®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent over $59,372.79 on UCB's Metadate®.

471.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other UCB drugs since at least 2002. Upon information and belief, UCB has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

472.    When UCB's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding UCB's

discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within UCB's control at this time and will be revealed through discovery.

473.    At all times relevant herein, UCB, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## VV.   Watson Defendants

474.    At all times relevant hereto, Watson routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County. From 2002-2006 Orange County paid over $1.9 million for Watson's prescription drugs.

475.    It is believed that, Watson reported inflated average wholesale prices for Nicotine, as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $189,599.67 on Watson's Nicotine Patch.

476.    It is believed that, Watson reported inflated average wholesale prices for Hydrocodone as shown in Exhibit A, resulting in a significant overcharge to Orange County. During the relevant time period, it is estimated that Orange County spent over $152,434.72 on Watson's Hydrocodone.

477.    Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Watson drugs since at least 2002.  Upon information and belief, Watson has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

478.    When Watson's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Watson's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Watson's control at this time and will be revealed through discovery.

479.    At all times relevant herein, Watson, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

480.    Watson's fraudulent pricing practices were investigated by the following: the House Committee on Energy and Finance, the DOJ, the OIG, the Attorneys General for the States of California, Massachusetts, Montana, Pennsylvania, and Wisconsin.  Watson's subsidiary, Schein, was also investigated by the Attorney General of Texas.  The findings of these investigations confirm Watson's fraudulent pricing practices.

## WW.   Wyeth

481.    At all times relevant hereto, Wyeth routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Orange County.  From 2002-2006 Orange County paid over $4.2 million for Wyeth's prescription drugs.

482.    It is believed that, Wyeth reported inflated average wholesale prices for Effexor®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant time period, it is estimated that Orange County spent $1,426,998.66 on Wyeth's Effexor®.

483.    It is believed that, Wyeth reported inflated average wholesale prices for Protonix®, as shown in Exhibit A, resulting in a significant overcharge to Orange County.  During the relevant

time period, it is estimated that Orange County spent over $1,375,513.49 on Wyeth's Protonix®.

484.   Orange County alleges that it has been overcharged for every drug listed in Exhibit A and other Wyeth drugs since at least 2002.   Upon information and belief, Wyeth has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Orange County for all covered drugs.

485.   When Wyeth's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater.   The facts surrounding Wyeth's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Wyeth's control at this time and will be revealed through discovery.

486.   At all times relevant herein, Wyeth, on behalf of the relevant Manufacturer-Publisher Enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

487.   Wyeth's fraudulent pricing practices were investigated by the Senate Finance Committee and the OIG.

## VII.   DAMAGES TO ORANGE COUNTY'S MEDICAID PROGRAM

488.   Orange County's Medicaid Program spent approximately $188,547,473.24 for Medicaid covered drugs from 2002 - 2006.   A significant part of this expenditure is a result of Defendants' false and inflated AWPs, failure to report best prices and proper rebates, and other illegal practices alleged herein.

489.   Even assuming the most conservative estimates of the spread between actual cost and AWP, Orange County has overpaid by millions of dollars.

490.   Medicaid's spending on prescription drugs has increased rapidly in recent years, growing at an average annual inflation-adjusted rate of 15 percent between 1998 and 2004 to a level of about $30 billion.  Clearly, Orange County is one of many caught up in the Defendants' prolific industry-wide scheme.

491.   Over the years, Defendants' scheme has resulted in their unjust retention of millions of dollars belonging to the taxpayers of Orange County.  Through this action, Orange County seeks to recoup these monies and stop Defendants from continuing to defraud the County and its residents out of millions of dollars each year.

## IX.   CLAIMS FOR RELIEF

### COUNT I:   VIOLATIONS OF 18 U.S.C. § 1962 (C) ("R.I.C.O") (AGAINST Defendant DRUG MANUFACTURERS FOR UNLAWFUL CONDUCT ASSOCIATED WITH MEDICAID COVERED DRUGS)

492.   Orange County realleges and incorporates the preceding paragraphs as if fully set forth herein.

493.   This Count alleges the Defendants violation of the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. § 1962(c).

494.   Both Orange County and the Defendants named herein meet the definition of "persons" under RICO as defined in 18 U.S.C. § 1961(3).  Additionally, the following publishers of pharmaceutical industry compendia report Defendants' AWPs, both in printed and electronic format, for various dosages of drugs are also "persons" pursuant to 18 U.S.C. § 1961(3):

(a)   Thomson Medical Economics, publisher of the Drug Topics RedBook ("RedBook"), is a division of the Thomson Corporation, a Delaware corporation with its principal place of business

at One Station Place, Stamford, Connecticut;

(b)     First DataBank, Inc., publisher of American Druggist First DataBank Annual Directory of Pharmaceuticals and Essential Directory of Pharmaceuticals, known as the Blue Book, is a Missouri Corporation with its principal place of business at 111 Bayhill Drive, San Bruno, California;

(c)     Facts & Comparisons, Inc., publisher of the Medi-Span Master Drug Data Base ("Medi-Span"), is a division of Lippincott, Williams & Wilkins, a Pennsylvania Corporation with a principal place of business at 530 Walnut Street, Philadelphia.

Collectively, the above named entities at ¶¶ (a),(b), and (c) above will be referred to as the "publishers."

495.    At all relevant times herein, Defendants each conducted the affairs of certain association-in-fact enterprises identified herein as the "Manufacturer-Publisher Enterprises," in violation of 18 U.S.C. § 1962 (c). The affairs of each enterprise effected interstate commerce and, through a pattern of racketeering activity, Defendants conducted the affairs of these enterprises.

496.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) one of the Publishers that reported AWPs and (b) a Defendant Drug Manufacturer, including its directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises."

497.    Each of the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading

-102-

AWPs which are often supplied by the Manufacturers as WACs and then converted by the Publishers into artificially inflated AWPs, and (b) deriving profits from these activities.

498.    Each of the enterprises had a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry generally, and specifically for the drugs of that Defendant. Without the AWP scheme, the manufacturing Defendants would not be able to market the spread. The publishers agreed to this scheme, because if they did not, the manufacturers could easily revert to the other methods of publishing prices or the publishers would have to independently investigate the AWP at significant expense.

499.    The Publishers also have an economic incentive to merely report the AWPs provided to them by the manufacturers because it saves the Publishers from having to spend money to extensively survey actual sales prices in the market. By simply republishing the prices submitted to them by the drug manufacturers, the Publishers reduce expenses and consequently reap greater profits.

500.    Thus, each of the Manufacturer-Publisher Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.

501.    The scheme is co-dependent. The Manufacturers' ability to market the spread created by the publication of false and inflated AWPs depends on the cooperation of the Publishers, through both misfeasance in converting WACs into AWPs, and nonfeasance in not independently affirming the accuracy of the AWPs. The Publishers' entire product was reliant on the information supplied to them by the Manufacturers. To protect that information supply the Publishers abandoned their duty to report honest AWP to the Medicare system and the public at large. Without the Manufacturers and the Publishers participating in the scheme, the AWP scheme could not have

succeeded.

502.    Each of the Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific Publisher that are its associates. As to each of the Manufacturer-Publisher Enterprises, there is a common communication network which permitted the Defendant Drug Manufacturers and the specific Publishers to function as a continuing unit. At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP scheme.

503.    On information and belief, at all relevant times Thomson Medical Economics, First DataBank, and Facts & Comparisons were each aware of the Defendant Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme. Each of the publishing manufacturers is aware that the published AWPs are inflated.

504.    This awareness comes from the following sources: First, at some point prior to 1992 the Publishers, in many instances, obtained AWPs themselves by survey. From their surveys of those in the distribution chain, the Publishers were and are aware that the reported AWPs were not accurate. Second, as various congressional bodies and government agencies reported on AWP inflation, the Publishers did not change or challenge the self reported AWPs, but continued blindly accepting them. Third, public documents confirm that when the State of Texas began prosecuting Dey Pharmaceuticals for its AWP practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's reported AWPs and published a different, far lower AWP. They withdrew from the Day enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs. This prompted a lawsuit by Dey alleging that the Publishers were treating Dey

differently than they were treating all other manufacturers.

505.    The foregoing evidences the Publishers' willing participation in the enterprise, their common purpose in the AWP scheme, and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported. This structure was the basis in which each of the enterprises was structured and its affairs conducted.

506.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-Publisher Enterprises*: The Abbott Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Abbott, and Abbott, including its directors, employees and agents: (1) the Abbott-Thomson Medical Enterprise; (2) the Abbott-First DataBank Enterprise; and (3) the Abbott-Facts & Comparisons Enterprise. Each of the Abbott Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Abbott Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons. As to each of these Abbott Manufacturer-Publisher Enterprises, there is a common communication network by which Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons share information on a regular basis. As to each of these Abbott Manufacturer-Publisher Enterprises, Abbott and Thomson Medical, Abbott and First DataBank, and

Abbott and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-Publisher Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b)     *The Alcon Manufacturer-Publisher Enterprises*: The Alcon Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Alcon, and Alcon, including its directors, employees and agents: (1) the Alcon-Thomson Medical Enterprise; (2) the Alcon-First DataBank Enterprise; and (3) the Alcon-Facts & Comparisons Enterprise. Each of the Alcon Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Alcon Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Alcon and Thomson Medical, Alcon and First DataBank, and Alcon and Facts & Comparisons. As to each of these Alcon Manufacturer-Publisher Enterprises, there is a common communication network by which Alcon and Thomson Medical, Alcon and First DataBank, and Alcon and Facts & Comparisons share information on a regular basis. As to each of these Alcon Manufacturer-Publisher Enterprises, Alcon and Thomson Medical, Alcon and First DataBank, and Alcon and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Alcon Manufacturer-Publisher Enterprises was operated and conducted by Alcon for criminal purposes, namely, carrying out the AWP Scheme.

(c)   *The Allergan Manufacturer-Publisher Enterprises*: The Allergan Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Allergan, and Allergan, including its directors, employees and agents: (1) the Allergan-Thomson Medical Enterprise; (2) the Allergan-First DataBank Enterprise; and (3) the Allergan-Facts & Comparisons Enterprise. Each of the Allergan Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Allergan Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Allergan and Thomson Medical, Allergan and First DataBank, and Allergan and Facts & Comparisons. As to each of these Allergan Manufacturer-Publisher Enterprises, there is a common communication network by which Allergan and Thomson Medical, Allergan and First DataBank, and Allergan and Facts & Comparisons share information on a regular basis. As to each of these Allergan Manufacturer-Publisher Enterprises, Allergan and Thomson Medical, Allergan and First DataBank, and Allergan and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Allergan Manufacturer-Publisher Enterprises was operated and conducted by Allergan for criminal purposes, namely, carrying out the AWP Scheme.

(d)   *The Alpharma Manufacturer-Publisher Enterprises*: The Alpharma Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Alpharma, and Alpharma,

including its directors, employees and agents: (1) the Alpharma-Thomson Medical Enterprise; (2) the Alpharma-First DataBank Enterprise; and (3) the Alpharma-Facts & Comparisons Enterprise. Each of the Alpharma Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Alpharma Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Alpharma and Thomson Medical, Alpharma and First DataBank, and Alpharma and Facts & Comparisons. As to each of these Alpharma Manufacturer-Publisher Enterprises, there is a common communication network by which Alpharma and Thomson Medical, Alpharma and First DataBank, and Alpharma and Facts & Comparisons share information on a regular basis. As to each of these Alpharma Manufacturer-Publisher Enterprises, Alpharma and Thomson Medical, Alpharma and First DataBank, and Alpharma and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Alpharma Manufacturer-Publisher Enterprises was operated and conducted by Alpharma for criminal purposes, namely, carrying out the AWP Scheme:

(c)     *The Amgen Manufacturer-Publisher Enterprises*: The Amgen Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Amgen, and Amgen, including its directors, employees and agents: (1) the Amgen-Thomson Medical Enterprise; (2) the Amgen-First DataBank Enterprise; and (3) the Amgen-Facts & Comparisons Enterprise. Each of the Amgen Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and

individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Amgen Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Amgen and Thomson Medical, Amgen and First DataBank, and Amgen and Facts & Comparisons. As to each of these Amgen Manufacturer-Publisher Enterprises, there is a common communication network by which Amgen and Thomson Medical, Amgen and First DataBank, and Amgen and Facts & Comparisons share information on a regular basis. As to each of these Amgen Manufacturer-Publisher Enterprises, Amgen and Thomson Medical, Amgen and First DataBank, and Amgen and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Amgen Manufacturer-Publisher Enterprises was operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP Scheme.

(f) *The Apotex Manufacturer-Publisher Enterprises*: The Apotex Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Apotex, and Apotex, including its directors, employees and agents: (1) the Apotex-Thomson Medical Enterprise; (2) the Apotex-First DataBank Enterprise; and (3) the Apotex-Facts & Comparisons Enterprise. Each of the Apotex Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Apotex Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Apotex

and Thomson Medical, Apotex and First DataBank, and Apotex and Facts & Comparisons. As to each of these Apotex Manufacturer-Publisher Enterprises, there is a common communication network by which Apotex and Thomson Medical, Apotex and First DataBank, and Apotex and Facts & Comparisons share information on a regular basis. As to each of these Apotex Manufacturer-Publisher Enterprises, Apotex and Thomson Medical, Apotex and First DataBank, and Apotex and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Apotex Manufacturer-Publisher Enterprises was operated and conducted by Apotex for criminal purposes, namely, carrying out the AWP Scheme.

(g)     *The Astellas Manufacturer-Publisher Enterprises*:   The Astellas Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Astellas, and Astellas, including its directors, employees and agents: (1) the Astellas-Thomson Medical Enterprise; (2) the Astellas-First DataBank Enterprise; and (3) the Astellas-Facts & Comparisons Enterprise. Each of the Astellas Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Astellas Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Astellas and Thomson Medical, Astellas and First DataBank, and Astellas and Facts & Comparisons. As to each of these Astellas Manufacturer-Publisher Enterprises, there is a common communication network by which Astellas and Thomson Medical, Astellas and First DataBank, and Astellas and Facts & Comparisons share information on a regular basis. As to

each of these Astellas Manufacturer-Publisher Enterprises, Astellas and Thomson Medical, Astellas and First DataBank, and Astellas and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Astellas Manufacturer-Publisher Enterprises was operated and conducted by Astellas for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The AstraZeneca Manufacturer-Publisher Enterprises*: The AstraZeneca Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by AstraZeneca, and AstraZeneca, including its directors, employees and agents: (1) the AstraZeneca-Thomson Medical Enterprise; (2) the AstraZeneca-First DataBank Enterprise; and (3) the AstraZeneca-Facts & Comparisons Enterprise. Each of the AstraZeneca Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the AstraZeneca Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons. As to each of these AstraZeneca Manufacturer-Publisher Enterprises, there is a common communication network by which AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons share information on a regular basis. As to each of these AstraZeneca Manufacturer-Publisher Enterprises, AstraZeneca and Thomson Medical, AstraZeneca and First DataBank, and AstraZeneca and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the AstraZeneca Manufacturer-Publisher

Enterprises was operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(i)    *The Barr Manufacturer-Publisher Enterprises*: The Barr Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Barr, and Barr, including its directors, employees and agents: (1) the Barr-Thomson Medical Enterprise; (2) the Barr-First DataBank Enterprise; and (3) the Barr-Facts & Comparisons Enterprise. Each of the Barr Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Barr Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Barr and Thomson Medical, Barr and First DataBank, and Barr and Facts & Comparisons. As to each of these Barr Manufacturer-Publisher Enterprises, there is a common communication network by which Barr and Thomson Medical, Barr and First DataBank, and Barr and Facts & Comparisons share information on a regular basis. As to each of these Barr Manufacturer-Publisher Enterprises, Barr and Thomson Medical, Barr and First DataBank, and Barr and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Barr Manufacturer-Publisher Enterprises was operated and conducted by Barr for criminal purposes, namely, carrying out the AWP Scheme.

(j)    *The Berlex Manufacturer-Publisher Enterprises*: The Berlex Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Berlex, and Berlex, including its directors, employees and

agents: (1) the Berlex-Thomson Medical Enterprise; (2) the Berlex-First DataBank Enterprise; and (3) the Berlex-Facts & Comparisons Enterprise. Each of the Berlex Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Berlex Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Berlex and Thomson Medical, Berlex and First DataBank, and Berlex and Facts & Comparisons. As to each of these Berlex Manufacturer-Publisher Enterprises, there is a common communication network by which Berlex and Thomson Medical, Berlex and First DataBank, and Berlex and Facts & Comparisons share information on a regular basis. As to each of these Berlex Manufacturer-Publisher Enterprises, Berlex and Thomson Medical, Berlex and First DataBank, and Berlex and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Berlex Manufacturer-Publisher Enterprises was operated and conducted by Berlex for criminal purposes, namely, carrying out the AWP Scheme.

(k)    *The Bristol-Myers Manufacturer-Publisher Enterprises*: The Bristol-Myers Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Bristol-Myers, and Bristol-Myers, including its directors, employees and agents: (1) the Bristol-Myers-Thomson Medical Enterprise; (2) the Bristol-Myers-First DataBank Enterprise; and (3) the Bristol-Myers-Facts & Comparisons Enterprise. Each of the Bristol-Myers Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have

been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Bristol-Myers Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bristol-Myers and Thomson Medical, Bristol-Myers and First DataBank, and Bristol-Myers and Facts & Comparisons. As to each of these Bristol-Myers Manufacturer-Publisher Enterprises, there is a common communication network by which Bristol-Myers and Thomson Medical, Bristol-Myers and First DataBank, and Bristol-Myers and Facts & Comparisons share information on a regular basis. As to each of these Bristol-Myers Manufacturer-Publisher Enterprises, Bristol-Myers and Thomson Medical, Bristol-Myers and First DataBank, and Bristol-Myers and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Bristol-Myers Manufacturer-Publisher Enterprises was operated and conducted by Bristol-Myers for criminal purposes, namely, carrying out the AWP Scheme.

(l)     *The Boehringer Manufacturer-Publisher Enterprises*: The Boehringer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Boehringer, and Boehringer, including its directors, employees and agents: (1) the Boehringer-Thomson Medical Enterprise; (2) the Boehringer-First DataBank Enterprise; and (3) the Boehringer-Facts & Comparisons Enterprise. Each of the Boehringer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Boehringer Manufacturer-Publisher

-114-

Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer and Thomson Medical, Boehringer and First DataBank, and Boehringer and Facts & Comparisons. As to each of these Boehringer Manufacturer-Publisher Enterprises, there is a common communication network by which Boehringer and Thomson Medical, Boehringer and First DataBank, and Boehringer and Facts & Comparisons share information on a regular basis. As to each of these Boehringer Manufacturer-Publisher Enterprises, Boehringer and Thomson Medical, Boehringer and First DataBank, and Boehringer and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Boehringer Manufacturer-Publisher Enterprises was operated and conducted by Boehringer for criminal purposes, namely, carrying out the AWP Scheme.

(m)     *The Dey Manufacturer-Publisher Enterprises*: The Dey Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Dey, and Dey, including its directors, employees and agents: (1) the Dey-Thomson Medical Enterprise; (2) the Dey-First DataBank Enterprise; and (3) the Dey-Facts & Comparisons Enterprise. Each of the Dey Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Dey Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons. As to each of these Dey Manufacturer-Publisher Enterprises, there is a common communication network by which Dey and

Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons share information on a regular basis. As to each of these Dey Manufacturer-Publisher Enterprises, Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Dey Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Scheme.

(n)     *The Eisai Manufacturer-Publisher Enterprises*: The Eisai Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Eisai, and Eisai, including its directors, employees and agents: (1) the Eisai-Thomson Medical Enterprise; (2) the Eisai-First DataBank Enterprise; and (3) the Eisai-Facts & Comparisons Enterprise. Each of the Eisai Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Eisai Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eisai and Thomson Medical, Eisai and First DataBank, and Eisai and Facts & Comparisons. As to each of those Eisai Manufacturer-Publisher Enterprises, there is a common communication network by which Eisai and Thomson Medical, Eisai and First DataBank, and Eisai and Facts & Comparisons share information on a regular basis. As to each of these Eisai Manufacturer-Publisher Enterprises, Eisai and Thomson Medical, Eisai and First DataBank, and Eisai and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Eisai Manufacturer-Publisher Enterprises was operated and conducted by Eisai for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Eli Lilly Manufacturer-Publisher Enterprises*: The Eli Lilly Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Eli Lilly, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-Thomson Medical Enterprise; (2) the Eli Lilly-First DataBank Enterprise; and (3) the Eli Lilly-Facts & Comparisons Enterprise. Each of the Eli Lilly Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Eli Lilly Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and Thomson Medical, Eli Lilly and First DataBank, and Eli Lilly and Facts & Comparisons. As to each of these Eli Lilly Manufacturer-Publisher Enterprises, there is a common communication network by which Eli Lilly and Thomson Medical, Eli Lilly and First DataBank, and Eli Lilly and Facts & Comparisons share information on a regular basis. As to each of these Eli Lilly Manufacturer-Publisher Enterprises, Eli Lilly and Thomson Medical, Eli Lilly and First DataBank, and Eli Lilly and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Eli Lilly Manufacturer-Publisher Enterprises was operated and conducted by Eli Lilly for criminal purposes, namely, carrying out the AWP Scheme.

(p)     *The Endo Manufacturer-Publisher Enterprises*: The Endo Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Endo, and Endo, including its directors, employees and agents: (1) the Endo-Thomson Medical Enterprise; (2) the Endo-First DataBank Enterprise; and (3)

the Endo-Facts & Comparisons Enterprise. Each of the Endo Manufacturer-Publisher Enterprises

is an ongoing and continuing business organization consisting of both corporations and individuals

that are and have been associated for the common of shared purposes of (a) publishing or otherwise

disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the

Endo Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Endo and Thomson

Medical, Endo and First DataBank, and Endo and Facts & Comparisons. As to each of these Endo

Manufacturer-Publisher Enterprises, there is a common communication network by which Endo and

Thomson Medical, Endo and First DataBank, and Endo and Facts & Comparisons share information

on a regular basis. As to each of these Endo Manufacturer-Publisher Enterprises, Endo and Thomson

Medical, Endo and First DataBank, and Endo and Facts & Comparisons functioned as continuing

but separate units. At all relevant times, each of the Endo Manufacturer-Publisher Enterprises was

operated and conducted by Endo for criminal purposes, namely, carrying out the AWP Scheme.

  (q)  *The Forest Pharm Manufacturer-Publisher Enterprises*: The Forest Pharm

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the

Publishers that reported the AWPs that were provided to them by Forest Pharm, and Forest Pharm,

including its directors, employees and agents: (1) the Forest Pharm-Thomson Medical Enterprise;

(2) the Forest Pharm-First DataBank Enterprise; and (3) the Forest Pharm-Facts & Comparisons

Enterprise. Each of the Forest Pharm Manufacturer-Publisher Enterprises is an ongoing and

continuing business organization consisting of both corporations and individuals that are and have

been associated for the common of shared purposes of (a) publishing or otherwise disseminating

false and misleading AWPs and (b) deriving profits from those activities. Each of the Forest Pharm

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Forest Pharm and Thomson Medical, Forest Pharm and First DataBank, and Forest Pharm and Facts & Comparisons. As to each of these Forest Pharm Manufacturer-Publisher Enterprises, there is a common communication network by which Forest Pharm and Thomson Medical, Forest Pharm and First DataBank, and Forest Pharm and Facts & Comparisons share information on a regular basis. As to each of these Forest Pharm Manufacturer-Publisher Enterprises, Forest Pharm and Thomson Medical, Forest Pharm and First DataBank, and Forest Pharm and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Forest Pharm Manufacturer-Publisher Enterprises was operated and conducted by Forest Pharm for criminal purposes, namely, carrying out the AWP Scheme.

(r)     *The Genentech Manufacturer-Publisher Enterprises*:   The Genentech Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Genentech, and Genentech, including its directors, employees and agents: (1) the Genentech-Thomson Medical Enterprise; (2) the Genentech-First DataBank Enterprise; and (3) the Genentech-Facts & Comparisons Enterprise. Each of the Genentech Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Genentech Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Genentech and Thomson Medical, Genentech and First

DataBank, and Genentech and Facts & Comparisons. As to each of these Genentech Manufacturer-Publisher Enterprises, there is a common communication network by which Genentech and Thomson Medical, Genentech and First DataBank, and Genentech and Facts & Comparisons share information on a regular basis. As to each of these Genentech Manufacturer-Publisher Enterprises, Genentech and Thomson Medical, Genentech and First DataBank, and Genentech and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Genentech Manufacturer-Publisher Enterprises was operated and conducted by Genentech for criminal purposes, namely, carrying out the AWP Scheme.

(s) *The Genzyme Manufacturer-Publisher Enterprises*: The Genzyme Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Genzyme, and Genzyme, including its directors, employees and agents: (1) the Genzyme-Thomson Medical Enterprise; (2) the Genzyme-First DataBank Enterprise; and (3) the Genzyme-Facts & Comparisons Enterprise. Each of the Genzyme Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Genzyme Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Genzyme and Thomson Medical, Genzyme and First DataBank, and Genzyme and Facts & Comparisons. As to each of these Genzyme Manufacturer-Publisher Enterprises, there is a common communication network by which Genzyme and Thomson Medical, Genzyme and First DataBank, and Genzyme and Facts & Comparisons share

information on a regular basis. As to each of these Genzyme Manufacturer-Publisher Enterprises, Genzyme and Thomson Medical, Genzyme and First DataBank, and Genzyme and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Genzyme Manufacturer-Publisher Enterprises was operated and conducted by Genzyme for criminal purposes, namely, carrying out the AWP Scheme.

(t)     *The Gilead Manufacturer-Publisher Enterprises:* The Gilead Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Gilead, and Gilead, including its directors, employees and agents: (1) the Gilead-Thomson Medical Enterprise; (2) the Gilead-First DataBank Enterprise; and (3) the Gilead-Facts & Comparisons Enterprise. Each of the Gilead Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Gilead Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Gilead and Thomson Medical, Gilead and First DataBank, and Gilead and Facts & Comparisons. As to each of these Gilead Manufacturer-Publisher Enterprises, there is a common communication network by which Gilead and Thomson Medical, Gilead and First DataBank, and Gilead and Facts & Comparisons share information on a regular basis. As to each of these Gilead Manufacturer-Publisher Enterprises, Gilead and Thomson Medical, Gilead and First DataBank, and Gilead and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Gilead Manufacturer-Publisher Enterprises was operated and conducted by Gilead for

criminal purposes, namely, carrying out the AWP Scheme.

(u)     *The GSK Manufacturer-Publisher Enterprises*: The GSK Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by GSK, and GSK, including its directors, employees and agents: (1) the GSK-Thomson Medical Enterprise; (2) the GSK-First DataBank Enterprise; and (3) the GSK-Facts & Comparisons Enterprise. Each of the GSK Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the GSK Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK and Thomson Medical, GSK and First DataBank, and GSK and Facts & Comparisons. As to each of these GSK Manufacturer-Publisher Enterprises, there is a common communication network by which GSK and Thomson Medical, GSK and First DataBank, and GSK and Facts & Comparisons share information on a regular basis. As to each of these GSK Manufacturer-Publisher Enterprises, GSK and Thomson Medical, GSK and First DataBank, and GSK and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the GSK Manufacturer-Publisher Enterprises was operated and conducted by GSK for criminal purposes, namely, carrying out the AWP Scheme.

(v)     *The Hoffmann-La Roche Manufacturer-Publisher Enterprises*: The Hoffmann-La Roche Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Hoffmann-La Roche, and Hoffmann-La Roche, including its directors, employees and agents: (1) the Hoffmann-La

-122-

Roche-Thomson Medical Enterprise; (2) the Hoffmann-La Roche-First DataBank Enterprise; and

(3) the Hoffmann-La Roche-Facts & Comparisons Enterprise. Each of the Hoffmann-La Roche

Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting

of both corporations and individuals that are and have been associated for the common of shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving

profits from these activities. Each of the Hoffmann-La Roche Manufacturer-Publisher Enterprises

has a systemic linkage because there are contractual relationships, financial ties, and continuing

coordination of activities between Hoffmann-La Roche and Thomson Medical, Hoffmann-La Roche

and First DataBank, and Hoffmann-La Roche and Facts & Comparisons. As to each of these

Hoffmann-La Roche Manufacturer-Publisher Enterprises, there is a common communication

network by which Hoffmann-La Roche and Thomson Medical, Hoffmann-La Roche and First

DataBank, and Hoffmann-La Roche and Facts & Comparisons share information on a regular basis.

As to each of these Hoffmann-La Roche Manufacturer-Publisher Enterprises, Hoffmann-La Roche

and Thomson Medical, Hoffmann-La Roche and First DataBank, and Hoffmann-La Roche and Facts

& Comparisons functioned as continuing but separate units. At all relevant times, each of the

Hoffmann-La Roche Manufacturer-Publisher Enterprises was operated and conducted by Hoffmann-

La Roche for criminal purposes, namely, carrying out the AWP Scheme.

(w)     *The Ivax Manufacturer-Publisher Enterprises*: The Ivax Manufacturer-Publisher

Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported

the AWPs that were provided to them by Ivax, and Ivax, including its directors, employees and

agents: (1) the Ivax-Thomson Medical Enterprise; (2) the Ivax-First DataBank Enterprise; and (3)

the Ivax-Facts & Comparisons Enterprise. Each of the Ivax Manufacturer-Publisher Enterprises is

an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Ivax Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Ivax and Thomson Medical, Ivax and First DataBank, and Ivax and Facts & Comparisons. As to each of these Ivax Manufacturer-Publisher Enterprises, there is a common communication network by which Ivax and Thomson Medical, Ivax and First DataBank, and Ivax and Facts & Comparisons share information on a regular basis. As to each of these Ivax Manufacturer-Publisher Enterprises, Ivax and Thomson Medical, Ivax and First DataBank, and Ivax and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Ivax Manufacturer-Publisher Enterprises was operated and conducted by Ivax for criminal purposes, namely, carrying out the AWP Scheme.

(x)     *The Johnson & Johnson Defendants'[13] Manufacturer-Publisher Enterprises*: The Johnson & Johnson Defendants Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by the Johnson & Johnson Defendants, and the Johnson & Johnson Defendants, including its directors, employees and agents: (1) the Johnson & Johnson-Thomson Medical Enterprise; (2) the Johnson & Johnson-First DataBank Enterprise; and (3) the Johnson & Johnson-Facts & Comparisons Enterprise. Each of the Johnson & Johnson Manufacturer Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that

---

[13]     The Johnson & Johnson Defendants are Johnson & Johnson, Janssen, Ortho-McNeil, and Ortho Biotech.

are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from these activities. Each of the Johnson & Johnson Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Johnson & Johnson and Thomson Medical, Johnson & Johnson and First DataBank, and Johnson & Johnson and Facts & Comparisons. As to each of these Johnson & Johnson Defendants Manufacturer-Publisher Enterprises, Johnson & Johnson Defendants and Thomson Medical, Johnson & Johnson and First DataBank, and Johnson & Johnson Defendants and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Defendants Manufacturer-Publisher Enterprises was operated and conducted by the Johnson & Johnson Defendants for criminal purposes, namely, carrying out the AWP Scheme.

(y)     *The King Manufacturer-Publisher Enterprises*: The King Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by King, and King, including its directors, employees and agents: (1) the King-Thomson Medical Enterprise; (2) the King-First DataBank Enterprise; and (3) the King-Facts & Comparisons Enterprise. Each of the King Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the King Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between King and Thomson Medical, King and First DataBank, and King and Facts & Comparisons. As to each of these King

Manufacturer-Publisher Enterprises, there is a common communication network by which King and Thomson Medical, King and First DataBank, and King and Facts & Comparisons share information on a regular basis. As to each of these King Manufacturer-Publisher Enterprises, King and Thomson Medical, King and First DataBank, and King and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the King Manufacturer-Publisher Enterprises was operated and conducted by King for criminal purposes, namely, carrying out the AWP Scheme.

(z)     *The MedImmune Manufacturer-Publisher Enterprises*:  The MedImmune Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by MedImmune, and MedImmune, including its directors, employees and agents: (1) the MedImmune-Thomson Medical Enterprise; (2) the MedImmune-First DataBank Enterprise; and (3) the MedImmune-Facts & Comparisons Enterprise. Each of the MedImmune Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the MedImmune Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between MedImmune and Thomson Medical, MedImmune and First DataBank, and MedImmune and Facts & Comparisons. As to each of these MedImmune Manufacturer-Publisher Enterprises, there is a common communication network by which MedImmune and Thomson Medical, MedImmune and First DataBank, and MedImmune and Facts & Comparisons share information on a regular basis. As to each of those MedImmune Manufacturer-Publisher Enterprises, MedImmune and Thomson Medical,

MedImmune and First DataBank, and MedImmune and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the MedImmune Manufacturer-Publisher Enterprises was operated and conducted by MedImmune for criminal purposes, namely, carrying out the AWP Scheme.

(aa)     *The Merck Manufacturer-Publisher Enterprises*: The Merck Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Merck, and Merck, including its directors, employees and agents: (1) the Merck-Thomson Medical Enterprise; (2) the Merck-First DataBank Enterprise; and (3) the Merck-Facts & Comparisons Enterprise. Each of the Merck Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Merck Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Merck and Thomson Medical, Merck and First DataBank, and Merck and Facts & Comparisons. As to each of those Merck Manufacturer-Publisher Enterprises, there is a common communication network by which Merck and Thomson Medical, Merck and First DataBank, and Merck and Facts & Comparisons share information on a regular basis. As to each of these Merck Manufacturer-Publisher Enterprises, Merck and Thomson Medical, Merck and First DataBank, and Merck and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Merck Manufacturer-Publisher Enterprises was operated and conducted by Merck for criminal purposes, namely, carrying out the AWP Scheme.

(bb)     *The Mylan Manufacturer-Publisher Enterprises*: The Mylan Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Mylan, and Mylan, including its directors, employees and agents: (1) the Mylan-Thomson Medical Enterprise; (2) the Mylan-First DataBank Enterprise; and (3) the Mylan-Facts & Comparisons Enterprise. Each of the Mylan Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Mylan Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Mylan and Thomson Medical, Mylan and First DataBank, and Mylan and Facts & Comparisons. As to each of these Mylan Manufacturer-Publisher Enterprises, there is a common communication network by which Mylan and Thomson Medical, Mylan and First DataBank, and Mylan and Facts & Comparisons share information on a regular basis. As to each of these Mylan Manufacturer-Publisher Enterprises, Mylan and Thomson Medical, Mylan and First DataBank, and Mylan and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Mylan Manufacturer-Publisher Enterprises was operated and conducted by Mylan for criminal purposes, namely, carrying out the AWP Scheme.

(cc)     *The Novartis Manufacturer-Publisher Enterprises*: The Novartis Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Novartis, and Novartis, including its directors, employees and agents: (1) the Novartis-Thomson Medical Enterprise; (2) the

Novartis-First DataBank Enterprise; and (3) the Novartis-Facts & Comparisons Enterprise. Each of the Novartis Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Novartis Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novartis and Thomson Medical, Novartis and First DataBank, and Novartis and Facts & Comparisons. As to each of these Novartis Manufacturer-Publisher Enterprises, there is a common communication network by which Novartis and Thomson Medical, Novartis and First DataBank, and Novartis and Facts & Comparisons share information on a regular basis. As to each of these Novartis Manufacturer-Publisher Enterprises, Novartis and Thomson Medical, Novartis and First DataBank, and Novartis and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Novartis Manufacturer-Publisher Enterprises was operated and conducted by Novartis for criminal purposes, namely, carrying out the AWP Scheme.

(dd)    *The Novo Manufacturer-Publisher Enterprises:* The Novo Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Novo, and Novo, including its directors, employees and agents: (1) the Novo-Thomson Medical Enterprise; (2) the Novo-First DataBank Enterprise; and (3) the Novo-Facts & Comparisons Enterprise. Each of the Novo Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise

-129-

disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Novo Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novo and Thomson Medical, Novo and First DataBank, and Novo and Facts & Comparisons. As to each of these Novo Manufacturer-Publisher Enterprises, there is a common communication network by which Novo and Thomson Medical, Novo and First DataBank, and Novo and Facts & Comparisons share information on a regular basis. As to each of these Novo Manufacturer-Publisher Enterprises, Novo and Thomson Medical, Novo and First DataBank, and Novo and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Novo Manufacturer-Publisher Enterprises was operated and conducted by Novo for criminal purposes, namely, carrying out the AWP Scheme.

(ee)   *The Otsuka Manufacturer-Publisher Enterprises:* The Otsuka Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Otsuka, and Otsuka, including its directors, employees and agents: (1) the Otsuka-Thomson Medical Enterprise; (2) the Otsuka-First DataBank Enterprise; and (3) the Otsuka-Facts & Comparisons Enterprise. Each of the Otsuka Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Otsuka Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Otsuka and Thomson Medical, Otsuka and First DataBank, and Otsuka and Facts & Comparisons. As to each of these Otsuka Manufacturer-Publisher Enterprises, there is a common communication

network by which Otsuka and Thomson Medical, Otsuka and First DataBank, and Otsuka and Facts & Comparisons share information on a regular basis. As to each of these Otsuka Manufacturer-Publisher Enterprises, Otsuka and Thomson Medical, Otsuka and First DataBank, and Otsuka and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Otsuka Manufacturer-Publisher Enterprises was operated and conducted by Otsuka for criminal purposes, namely, carrying out the AWP Scheme.

(ff)    *The Proctor & Gamble Manufacturer-Publisher Enterprises*: The Proctor & Gamble Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Proctor & Gamble, and Proctor & Gamble, including its directors, employees and agents: (1) the Proctor & Gamble-Thomson Medical Enterprise; (2) the Proctor & Gamble-First DataBank Enterprise; and (3) the Proctor & Gamble-Facts & Comparisons Enterprise. Each of the Proctor & Gamble Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Proctor & Gamble Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Proctor & Gamble and Thomson Medical, Proctor & Gamble and First DataBank, and Proctor & Gamble and Facts & Comparisons. As to each of these Proctor & Gamble Manufacturer-Publisher Enterprises, there is a common communication network by which Proctor & Gamble and Thomson Medical, Proctor & Gamble and First DataBank, and Proctor & Gamble and Facts & Comparisons share information on a regular basis. As to each of these Proctor & Gamble Manufacturer-Publisher

Enterprises, Proctor & Gamble and Thomson Medical, Proctor & Gamble and First DataBank, and Proctor & Gamble and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Proctor & Gamble Manufacturer-Publisher Enterprises was operated and conducted by Proctor & Gamble for criminal purposes, namely, carrying out the AWP Scheme.

(gg)   *The Par Manufacturer-Publisher Enterprises*: The Par Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Par, and Par, including its directors, employees and agents: (1) the Par-Thomson Medical Enterprise; (2) the Par-First DataBank Enterprise; and (3) the Par-Facts & Comparisons Enterprise. Each of the Par Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Par Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Par and Thomson Medical, Par and First DataBank, and Par and Facts & Comparisons. As to each of these Par Manufacturer-Publisher Enterprises, there is a common communication network by which Par and Thomson Medical, Par and First DataBank, and Par and Facts & Comparisons share information on a regular basis. As to each of these Par Manufacturer-Publisher Enterprises, Par and Thomson Medical, Par and First DataBank, and Par and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Par Manufacturer-Publisher Enterprises was operated and conducted by Par for criminal purposes, namely, carrying out the AWP Scheme.

(hh)    *The Pfizer Manufacturer-Publisher Enterprises*: The Pfizer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Pfizer, and Pfizer, including its directors, employees and agents: (1) the Pfizer-Thomson Medical Enterprise; (2) the Pfizer-First DataBank Enterprise; and (3) the Pfizer-Facts & Comparisons Enterprise. Each of the Pfizer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Pfizer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons. As to each of these Pfizer Manufacturer-Publisher Enterprises, there is a common communication network by which Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons share information on a regular basis. As to each of these Pfizer Manufacturer-Publisher Enterprises, Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pfizer Manufacturer-Publisher Enterprises was operated and conducted by Pfizer for criminal purposes, namely, carrying out the AWP Scheme.

(ii)    *The Purdue Manufacturer-Publisher Enterprises*: The Purdue Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Purdue, and Purdue, including its directors, employees and agents: (1) the Purdue-Thomson Medical Enterprise; (2) the Purdue-First DataBank Enterprise; and

(3) the Purdue-Facts & Comparisons Enterprise. Each of the Purdue Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Purdue Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Purdue and Thomson Medical, Purdue and First DataBank, and Purdue and Facts & Comparisons. As to each of these Purdue Manufacturer-Publisher Enterprises, there is a common communication network by which Purdue and Thomson Medical, Purdue and First DataBank, and Purdue and Facts & Comparisons share information on a regular basis. As to each of these Purdue Manufacturer-Publisher Enterprises, Purdue and Thomson Medical, Purdue and First DataBank, and Purdue and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Purdue Manufacturer-Publisher Enterprises was operated and conducted by Purdue for criminal purposes, namely, carrying out the AWP Scheme.

(jj)     *The Ranbaxy Manufacturer-Publisher Enterprises*:     The Ranbaxy Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Ranbaxy, and Ranbaxy, including its directors, employees and agents: (1) the Ranbaxy-Thomson Medical Enterprise; (2) the Ranbaxy-First DataBank Enterprise; and (3) the Ranbaxy-Facts & Comparisons Enterprise. Each of the Ranbaxy Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b)

deriving profits from those activities. Each of the Ranbaxy Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Ranbaxy and Thomson Medical, Ranbaxy and First DataBank, and Ranbaxy and Facts & Comparisons. As to each of these Ranbaxy Manufacturer-Publisher Enterprises, there is a common communication network by which Ranbaxy and Thomson Medical, Ranbaxy and First DataBank, and Ranbaxy and Facts & Comparisons share information on a regular basis. As to each of these Ranbaxy Manufacturer-Publisher Enterprises, Ranbaxy and Thomson Medical, Ranbaxy and First DataBank, and Ranbaxy and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Ranbaxy Manufacturer-Publisher Enterprises was operated and conducted by Ranbaxy for criminal purposes, namely, carrying out the AWP Scheme.

(kk)    *The Sanofi Manufacturer-Publisher Enterprises*: The Sanofi Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Sanofi, and Sanofi, including its directors, employees and agents: (1) the Sanofi-Thomson Medical Enterprise; (2) the Sanofi-First DataBank Enterprise; and (3) the Sanofi-Facts & Comparisons Enterprise. Each of the Sanofi Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Sanofi Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and Thomson Medical, Sanofi and First DataBank, and Sanofi and Facts & Comparisons. As to each of

these Sanofi Manufacturer-Publisher Enterprises, there is a common communication network by which Sanofi and Thomson Medical, Sanofi and First DataBank, and Sanofi and Facts & Comparisons share information on a regular basis. As to each of these Sanofi Manufacturer-Publisher Enterprises, Sanofi and Thomson Medical, Sanofi and First DataBank, and Sanofi and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Sanofi Manufacturer-Publisher Enterprises was operated and conducted by Sanofi for criminal purposes, namely, carrying out the AWP Scheme.

(ii)   *The Schering Manufacturer-Publisher Enterprises*:   The Schering Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Schering, and Schering, including its directors, employees and agents: (1) the Schering-Thomson Medical Enterprise; (2) the Schering-First DataBank Enterprise; and (3) the Schering-Facts & Comparisons Enterprise. Each of the Schering Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Schering Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering and Thomson Medical, Schering and First DataBank, and Schering and Facts & Comparisons. As to each of these Schering Manufacturer-Publisher Enterprises, there is a common communication network by which Schering and Thomson Medical, Schering and First DataBank, and Schering and Facts & Comparisons share information on a regular basis. As to each of these Schering Manufacturer-Publisher Enterprises, Schering and Thomson

Medical, Schering and First DataBank, and Schering and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Schering Manufacturer-Publisher Enterprises was operated and conducted by Schering for criminal purposes, namely, carrying out the AWP Scheme.

(mm) *The Schwarz Manufacturer-Publisher Enterprises*: The Schwarz Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Schwarz, and Schwarz, including its directors, employees and agents: (1) the Schwarz-Thomson Medical Enterprise; (2) the Schwarz-First DataBank Enterprise; and (3) the Schwarz-Facts & Comparisons Enterprise. Each of the Schwarz Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Schwarz Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schwarz and Thomson Medical, Schwarz and First DataBank, and Schwarz and Facts & Comparisons. As to each of these Schwarz Manufacturer-Publisher Enterprises, there is a common communication network by which Schwarz and Thomson Medical, Schwarz and First DataBank, and Schwarz and Facts & Comparisons share information on a regular basis. As to each of these Schwarz Manufacturer-Publisher Enterprises, Schwarz and Thomson Medical, Schwarz and First DataBank, and Schwarz and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Schwarz Manufacturer-Publisher Enterprises was operated and conducted by Schwarz for criminal purposes, namely, carrying out the

AWP Scheme.

(nn)   *The Sepracor Manufacturer-Publisher Enterprises*: The Sepracor Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Sepracor, and Sepracor, including its directors, employees and agents: (1) the Sepracor-Thomson Medical Enterprise; (2) the Sepracor-First DataBank Enterprise; and (3) the Sepracor-Facts & Comparisons Enterprise. Each of the Sepracor Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Sepracor Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sepracor and Thomson Medical, Sepracor and First DataBank, and Sepracor and Facts & Comparisons. As to each of these Sepracor Manufacturer-Publisher Enterprises, there is a common communication network by which Sepracor and Thomson Medical, Sepracor and First DataBank, and Sepracor and Facts & Comparisons share information on a regular basis. As to each of these Sepracor Manufacturer-Publisher Enterprises, Sepracor and Thomson Medical, Sepracor and First DataBank, and Sepracor and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Sepracor Manufacturer-Publisher Enterprises was operated and conducted by Sepracor for criminal purposes, namely, carrying out the AWP Scheme.

(oo)   *The Shire Manufacturer-Publisher Enterprises*: The Shire Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported

the AWPs that were provided to them by Shire, and Shire, including its directors, employees and agents: (1) the Shire-Thomson Medical Enterprise; (2) the Shire-First DataBank Enterprise; and (3) the Shire-Facts & Comparisons Enterprise. Each of the Shire Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Shire Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Shire and Thomson Medical, Shire and First DataBank, and Shire and Facts & Comparisons. As to each of these Shire Manufacturer-Publisher Enterprises, there is a common communication network by which Shire and Thomson Medical, Shire and First DataBank, and Shire and Facts & Comparisons share information on a regular basis. As to each of these Shire Manufacturer-Publisher Enterprises, Shire and Thomson Medical, Shire and First DataBank, and Shire and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Shire Manufacturer-Publisher Enterprises was operated and conducted by Shire for criminal purposes, namely, carrying out the AWP Scheme.

(pp)    *The Takeda Manufacturer-Publisher Enterprises*:  The Takeda Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Takeda, and Takeda, including its directors, employees and agents: (1) the Takeda-Thomson Medical Enterprise; (2) the Takeda-First DataBank Enterprise; and (3) the Takeda-Facts & Comparisons Enterprise. Each of the Takeda Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Takeda Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Takeda and Thomson Medical, Takeda and First DataBank, and Takeda and Facts & Comparisons. As to each of these Takeda Manufacturer-Publisher Enterprises, there is a common communication network by which Takeda and Thomson Medical, Takeda and First DataBank, and Takeda and Facts & Comparisons share information on a regular basis. As to each of these Takeda Manufacturer-Publisher Enterprises, Takeda and Thomson Medical, Takeda and First DataBank, and Takeda and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Takeda Manufacturer-Publisher Enterprises was operated and conducted by Takeda for criminal purposes, namely, carrying out the AWP Scheme.

(qq)    *The TAP Manufacturer-Publisher Enterprises*: The TAP Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by TAP, and TAP, including its directors, employees and agents: (1) the TAP-Thomson Medical Enterprise; (2) the TAP-First DataBank Enterprise; and (3) the TAP-Facts & Comparisons Enterprise. Each of the TAP Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the TAP Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between TAP and Thomson Medical, TAP and First DataBank, and TAP and Facts & Comparisons. As to each of these TAP

Manufacturer-Publisher Enterprises, there is a common communication network by which TAP and Thomson Medical, TAP and First DataBank, and TAP and Facts & Comparisons share information on a regular basis. As to each of these TAP Manufacturer-Publisher Enterprises, TAP and Thomson Medical, TAP and First DataBank, and TAP and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the TAP Manufacturer-Publisher Enterprises was operated and conducted by TAP for criminal purposes, namely, carrying out the AWP Scheme.

(π)     *The Taro Manufacturer-Publisher Enterprises*:  The Taro Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Taro, and Taro, including its directors, employees and agents: (1) the Taro-Thomson Medical Enterprise; (2) the Taro-First DataBank Enterprise; and (3) the Taro-Facts & Comparisons Enterprise. Each of the Taro Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Taro Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Taro and Thomson Medical, Taro and First DataBank, and Taro and Facts & Comparisons. As to each of these Taro Manufacturer-Publisher Enterprises, there is a common communication network by which Taro and Thomson Medical, Taro and First DataBank, and Taro and Facts & Comparisons share information on a regular basis. As to each of these Taro Manufacturer-Publisher Enterprises, Taro and Thomson Medical, Taro and First DataBank, and Taro and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Taro Manufacturer-Publisher Enterprises was

-141-

operated and conducted by Taro for criminal purposes, namely, carrying out the AWP Scheme.

(ss)    *The Teva Manufacturer-Publisher Enterprises*: The Teva Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Teva, and Teva, including its directors, employees and agents: (1) the Teva-Thomson Medical Enterprise; (2) the Teva-First DataBank Enterprise; and (3) the Teva-Facts & Comparisons Enterprise. Each of the Teva Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Teva Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Teva and Thomson Medical, Teva and First DataBank, and Teva and Facts & Comparisons. As to each of these Teva Manufacturer-Publisher Enterprises, there is a common communication network by which Teva and Thomson Medical, Teva and First DataBank, and Teva and Facts & Comparisons share information on a regular basis. As to each of these Teva Manufacturer-Publisher Enterprises, Teva and Thomson Medical, Teva and First DataBank, and Teva and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Teva Manufacturer-Publisher Enterprises was operated and conducted by Teva for criminal purposes, namely, carrying out the AWP Scheme.

(tt)    *The Tyco Manufacturer-Publisher Enterprises*: The Tyco Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Tyco, and Tyco, including its directors, employees and agents: (1) the Tyco-Thomson Medical Enterprise; (2) the Tyco-First DataBank Enterprise; and (3)

the Tyco-Facts & Comparisons Enterprise. Each of the Tyco Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Tyco Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Tyco and Thomson Medical, Tyco and First DataBank, and Tyco and Facts & Comparisons. As to each of these Tyco Manufacturer-Publisher Enterprises, there is a common communication network by which Tyco and Thomson Medical, Tyco and First DataBank, and Tyco and Facts & Comparisons share information on a regular basis. As to each of these Tyco Manufacturer-Publisher Enterprises, Tyco and Thomson Medical, Tyco and First DataBank, and Tyco and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Tyco Manufacturer-Publisher Enterprises was operated and conducted by Tyco for criminal purposes, namely, carrying out the AWP Scheme.

(nn)    *The UCB Manufacturer-Publisher Enterprises*: The UCB Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by UCB, and UCB, including its directors, employees and agents: (1) the UCB-Thomson Medical Enterprise; (2) the UCB-First DataBank Enterprise; and (3) the UCB-Facts & Comparisons Enterprise. Each of the UCB Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the UCB Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between UCB and Thomson Medical, UCB and First DataBank, and UCB and Facts & Comparisons. As to each of these UCB Manufacturer-Publisher Enterprises, there is a common communication network by which UCB and Thomson Medical, UCB and First DataBank, and UCB and Facts & Comparisons share information on a regular basis. As to each of these UCB Manufacturer-Publisher Enterprises, UCB and Thomson Medical, UCB and First DataBank, and UCB and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the UCB Manufacturer-Publisher Enterprises was operated and conducted by UCB for criminal purposes, namely, carrying out the AWP Scheme.

(vv) *The Watson Manufacturer-Publisher Enterprises*: The Watson Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Watson, and Watson, including its directors, employees and agents: (1) the Watson-Thomson Medical Enterprise; (2) the Watson-First DataBank Enterprise; and (3) the Watson-Facts & Comparisons Enterprise. Each of the Watson Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Watson Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons. As to each of these Watson Manufacturer-Publisher Enterprises, there is a common communication network by which Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons share information on a regular basis. As to

each of these Watson Manufacturer-Publisher Enterprises, Watson and Thomson Medical, Watson and First DataBank, and Watson and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Watson Manufacturer-Publisher Enterprises was operated and conducted by Watson for criminal purposes, namely, carrying out the AWP Scheme.

(ww)   *The Wyeth Manufacturer-Publisher Enterprises:* The Wyeth Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Wyeth, and Wyeth, including its directors, employees and agents: (1) the Wyeth-Thomson Medical Enterprise; (2) the Wyeth-First DataBank Enterprise; and (3) the Wyeth-Facts & Comparisons Enterprise. Each of the Wyeth Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities. Each of the Wyeth Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Wyeth and Thomson Medical, Wyeth and First DataBank, and Wyeth and Facts & Comparisons. As to each of these Wyeth Manufacturer-Publisher Enterprises, there is a common communication network by which Wyeth and Thomson Medical, Wyeth and First DataBank, and Wyeth and Facts & Comparisons share information on a regular basis. As to each of these Wyeth Manufacturer-Publisher Enterprises, Wyeth and Thomson Medical, Wyeth and First DataBank, and Wyeth and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Wyeth Manufacturer-Publisher Enterprises was operated and conducted by Wyeth for criminal purposes, namely, carrying out the AWP Scheme.

507.   The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate their AWP Schemes involved thousands of communications throughout the relevant time including, *inter alia*:

(a)   Marketing materials about the AWPs for Covered Drugs and the available spread, which were sent to providers located across the country;

(b)   Written representations of the false and inflated AWPs for Covered Drugs as set forth in Exhibit A made to the RedBook and similar publications, which were made at least annually, and in many cases, several times during a single year;

(c)   Thousands of written and oral communications discussing, confirming, and forwarding free samples of drugs, for which the Defendants understood that the providers would unlawfully seek inflated reimbursement;

(d)   Documents providing information or incentives designed to lessen the prices that providers paid for the drugs, and/or to conceal those prices or the AWP Scheme alleged herein;

(e)   Written communications, including checks, documents discussing and relating to grants, payments of consulting fees, debt forgiveness and/or other financial inducements, as detailed herein;

(f)   Written and oral communications with U.S. and state Government agencies and private insurers that fraudulently misrepresented what the AWPs for Covered Drugs were, or that were intended to deter investigations into the AWPs for the Covered Drugs or to forestall changes to reimbursement based on something other than AWPs;

(g)   Written and oral communications with health insurers and patients, inducing payments for Covered Drugs that were made in reliance on AWPs; and

(h)   Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendants' AWP Scheme.

508.   In addition to the above-referenced RICO predicate acts, the Defendants' respective corporate headquarters have communicated by use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the AWP Scheme.

## Conduct of the RICO Enterprises' Affairs and RICO Conspiracy

509.   During all relevant times, each Defendant has exerted control over its particular Publisher Enterprise in violation of Section 1963(c) of RICO, has conducted or participated in the conduct of the affairs of that particular RICO enterprise, directly or indirectly, in the following ways:

(a)   Each Defendant has directly controlled the price at which providers purchase its Covered Drugs;

(b)   Each Manufacturer/Publisher enterprise has directly controlled the false and inflated AWPs that are reported in the RedBook and similar industry publications;

(c)   Each Defendant has directly controlled the price at which providers are reimbursed by the Medicaid Program;

(d)   Each Defendant has directly controlled the creation and distribution of marketing, sales, and other materials used to inform providers located nationwide of the profit potential of its Covered Drugs;

(e)   Each Defendant has directly controlled the marketing and sales scheme to artificially and unlawfully inflate the Medicaid reimbursement rate (and co-payment rate) to induce providers to prescribe Covered Drugs to their patients; and

(f)     Each Defendant has directly controlled the use and distribution of free samples of its covered drugs to providers.

510.    Each Defendant has directly or indirectly controlled the ability of providers to unlawfully seek reimbursement from the Medicaid Program for free samples;

511.    Each Defendant has relied upon its employees and agents to promote the AWP schemes alleged herein through the U.S. mails, through interstate wire facilities, and through direct contacts with providers; and

512.    Each Defendant has controlled and participated in the affairs of its respective Publisher Enterprise by using a fraudulent scheme to manufacture, market and sell its Covered Drugs through the use of unlawful inducements to providers.

513.    Each of the Publisher Enterprises identified in ¶ 341 of this Amended Complaint had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer. Each of the distribution enterprises also had a consensual decision-making structure because, as described above, each Defendant knew it was part of the AWP scheme and the providers played an active role in the affairs of the enterprise. In violation of Section 1962(d) of RICO, each of the Defendants and each of the providers that were members of the Distribution Enterprises conspired to conduct the affairs of such enterprises through the pattern of racketeering activity alleged herein. The conspiratorial agreement between the Defendants and the providers and their overt acts are described in this Complaint.

**Pattern of Racketeering Activity**

514.    Each of the Defendants has conducted and participated in the affairs of its respective Publisher Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Defendants intended to defraud Orange County and other Medicaid payors, the foreseeable and intended victims of the AWP Scheme.

515.    The Defendants' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their covered drugs, thereby creating a "spread" based on the inflated figure in order to induce providers to prescribe their Covered Drugs to their patients and causing the Medicaid program to pay an artificially-inflated rate of reimbursement for the Covered Drugs. The Defendants' AWP Scheme also consisted of providing free samples of the drugs to providers, instructing (or urging) such providers to bill the Medicaid program for these free samples, and providing the providers with other unlawful financial incentives, including kickbacks and bribes, to induce use of the Covered Drugs.

516.    The AWP Scheme was calculated and intentionally crafted so as to ensure that the Medicaid Program would be over-billed for the covered drugs. In designing and implementing the AWP Scheme, the Defendants were at all cognizant of the fact that the entire Medicaid Program and

all patients for whom the covered drugs are prescribed rely upon the honesty of the Defendants in setting the AWP as reported in the RedBook and similar publications. Thus, Plaintiff was an intended target and victim of the Defendants' AWP Scheme.

517.    By intentionally and artificially inflating the AWP and thereby affording the providers with unlawful financial inducements to use the covered drugs, and by subsequently failing to disclose such practices to the patients from whom reimbursement was sought through the U.S. mails or interstate wire facilities, the Defendants engaged in fraudulent, and unlawful conduct constituting a pattern of racketeering activity.

518.    The Defendants' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Orange County and all Medicaid payors. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff. Each of the Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Distribution Enterprise and the Medicaid Enterprise.

519.    The Defendants' violations of federal law and their pattern of racketeering activity have directly, proximately and foreseeably caused Orange County to be injured in its business or property because Orange County has paid many millions of dollars in inflated reimbursements or other payments for covered drugs.

520.    Defendants sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme. As required by federal and state Medicaid law, plaintiff has made inflated

reimbursement payments for Covered Drugs based on and/or in reliance on reported and false AWPs.

521.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiff for three times the damages that Plaintiff has sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II:   VIOLATION OF FEDERAL MEDICAID STATUTE, 42 U.S.C. §1396r-8 (FAILURE TO COMPLY WITH FEDERAL MEDICAID REBATE PROVISION)

522.    Orange County realleges and incorporates the preceding paragraphs 1 through 521 as if fully set forth herein.

523.    Each Defendant named herein is the manufacturer of a Medicaid covered drug.

524.    Each Defendant entered into a rebate agreement with the Secretary of HHS on behalf of the State of New York, and thereby, Orange County, pursuant to 42 U.S.C. § 1396r-8, in which said manufacturer agreed to report its best price to the Medicaid Program.

525.    Based on the structure of New York State's federally approved plan, which makes Orange County a service district responsible to pay 25% of Medicaid costs, Orange County is within the class of beneficiaries for whom 42 U.S.C. § 1396r-8 was intended to benefit.

526.    Rather than accurately report their best prices to Medicaid, and in furtherance of their scheme to inflate AWPs, Defendants routinely excluded chargebacks, rebates, discounts, free samples, and other inducements.  Through these actions the Defendants caused the reported prices to become diluted.

527.   As demonstrated above, each drug manufacturer, although mandated to comply with 42 U.S.C. § 1396r, in its efforts to compete for the business of providers, wholesalers, PBMs, and others, Defendants intentionally defrauded Medicaid by providing false information and inaccurate rebates.

528.   As a result of their routine failure to submit accurate and complete information in connection with the calculation of rebates owed to Medicaid, each Defendant violated 42 U.S.C. § 1396r-8.

529.   As a consequence of Defendants' violations, Orange County's Medicaid payments for its residents prescriptions were and continue to be higher than they would be if Defendants accurately reported "best price."

530.   At all times relevant hereto, Defendants knew or should have know of the falsity of the information submitted to Medicaid.

531.   As a direct consequence of each Defendant's failures, each is in violation of the terms of their Medicaid Rebate Agreements and through this violation they have deprived Orange County of its lawful entitlement to a portion of said rebates.

532.   As such, Orange County is therefore entitled to recoup its share of any rebates underpaid or not paid by the Defendants, as well as any other damages appropriate as a result of these violations.

## COUNT III: VIOLATION OF N.Y. SOCIAL SERVICES LAW § 367-A(7)(d) (FAILURE TO COMPLY WITH STATE MEDICAID REBATE PROVISION TO PROVIDE BEST PRICE)

533.   Orange County realleges and incorporates the preceding paragraphs 1 through 532 as if fully set forth herein.

534.   Each Defendant named herein is the manufacturer of a Medicaid covered drug.

535.   New York Social Services Law § 367-a(7)(d) expressly incorporates the federal Medicaid rebate provision 42 U.S.C. § 1396r-8, and provides in pertinent part that:

> Notwithstanding any in consistent provision of law, if a manufacturer (as defined under section 1927 of the federal social security act) has entered into a rebate agreement with the department or with the federal secretary of health and human services... the department shall reimburse for covered outpatient drugs which are dispensed under the medical assistance program... only pursuant to the terms of the rebate agreement...

536.   As stated above, although the Defendants were mandated to comply with 42 U.S.C. § 1396r, in their efforts to compete for the business of providers, wholesalers, PBMs, and others, Defendants intentionally defrauded Medicaid by providing false information and inaccurate rebates.

537.   Defendants' submission of untrue, inaccurate and misleading information for use in determining the amount of reimbursement under the Medicaid program thereby violated N.Y. Soc. Serv. Law § 367-a(7)(d), New York States's Medicaid Rebate provision.

538.   At all times relevant hereto, Defendants knew or should have know the falsity of the information submitted to Medicaid.

539.   As a direct consequence of Defendants' failures they are in violation of the terms of their Medicaid Rebate Agreements and through this violation they have deprived Orange County of its lawful entitlement to a portion of said rebates.

540.   As a result of each Defendant's conduct, Orange County overpaid for Medicaid drug costs. Orange County is therefore entitled to recoup its share of any rebates underpaid or not paid by the Defendants, as well as any other damages appropriate as a result of these violations.

## COUNT IV: VIOLATION OF N.Y. SOCIAL SERVICES LAW § 145-b (OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS)

541.   Orange County realleges and incorporates the preceding paragraphs 1 through 540 as if fully set forth herein.

542.   Each Defendant named herein is the manufacturer of a Medicaid covered drug.

543.   New York Social Services Law § 145-b(1)(a) makes it unlawful for:

[A]ny person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished pursuant to this chapter.

544.   Section (1)(b) defines "statement or representation" to include a "report of data which serves as the basis for a claim or a rate of payment." Defendants made and continue to make false reports of best price data which would be included in this definition. In addition, Defendants did and still do "attempt to obtain . . . [and did] obtain payment from public funds for . . . supplies furnished." Public funds are deemed to be obtained where they ". . . are used to reimburse or make prospective payment to an entity from which payment was attempted or obtained." N.Y. Soc. Serv. Law § 145-b(1)(c).

545.   As detailed above, Defendants have knowingly made and continue to make false statements and representations and engaged in a fraudulent scheme on behalf of themselves and

others to defraud the Medicaid Program and, thereby, Orange County.

546. Each Defendant named herein violated N.Y. Soc. Svc. Law § 145-b when it made false statements and/or deliberately concealed material facts in obtaining a payment from Orange County Medicaid. Through their fraudulent actions, Defendants attempted to obtain and did obtain Medicaid funds in the form of overpayments for drugs.

547. As a result of this conduct, Defendants violated New York Social Services Law § 145-b. The County seeks damages against Defendants as a result of such violations, including treble damages.

## COUNT V: VIOLATION OF NEW YORK DEPARTMENT OF HEALTH REGULATIONS 18 N.Y.C.R.R § 515.2(b)(4) and (5)

548. Orange County realleges and incorporates the preceding paragraphs 1 through 547 as if fully set forth herein.

549. Each Defendant named herein is the manufacturer of a Medicaid covered drug.

550. New York Department of Health Regulations, 18 NYCRR §515.2 defines "unacceptable practices under the medical assistance program." Subsection (b)(4) includes the conversion of "a medical assistance payment, or any part of such payment, to a use or benefit other than for the use and benefit intended by the medical assistance program," among the unacceptable practices constituting fraud or abuse.

551. Subsection (b)(5) includes undisclosed and unaccounted for bribes and kickbacks among the unacceptable practices, including:

offering or paying either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for purchasing, leasing, ordering or recommending any medical care, services or supplies for which payment is claimed under the program.

18 NYCRR §515.2(b)(5)(iv):

552.    By and through their conduct detailed herein, specifically through the inducements offered to providers, wholesalers, PBMs and other non-Medicaid payers in an attempt to drive up sales of each's drug over competing similar drugs Defendants routinely violated 18 N.Y.C.R.R. §515.2(b)(4) and (5).  As such, the County seeks damages against Defendants as a result of these violations.

### COUNT VI:  BREACH OF CONTRACT

553.    Orange County realleges and incorporates the preceding paragraphs 1 through 552 as if fully set forth herein.

554.    As a requirement of participation in the Medicaid Rebate Program each Defendant entered into a rebate agreement with HHS.  The nature of those rebate agreements is to ensure Medicaid is offered a Manufacturers' best price.  The purpose of the "best price" system is to limit state Medicaid drug expenditures.

555.    Each rebate agreement is entered into by the Defendants and executed by the Secretary of HHS "on behalf of the States."

556.    As stated, New York's federally approved Medicaid plan incorporates the use of local agencies, such as Orange County to administer and pay 25 percent of Medicaid costs.  Due to the

structure of this plan, any agreement made on behalf of the State of New York must acknowledge and incorporate the role of Orange County as a local agency participating in the State's Medicaid plan.  Accordingly, Orange County is an intended third-party beneficiary to all Medicaid Rebate Agreements executed on behalf of New York State.

557.    Pursuant to the federal Medicaid statute, 42 U.S.C. § 1396a(a)(25)(A), the state or local agency administering the plan, such as Orange County, is required to take "all reasonable measures to ascertain the legal liability of third parties for any overcharges and submit to the Secretary of Health and Human Services a plan for pursuing such claims." 42 U.S.C. § 1396a(25)(B) specifically provides.

> . . . in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek reimbursement for such assistance to the extent of such legal liability.

As such, Orange County is authorized to file a suit for and seek recovery in this instance.

558.    Insofar as the Defendants named herein have violated their obligations under any Medicaid Rebate Agreement made on behalf of New York State by failing to report their best price or not paying proper discounts, Orange County was overcharged and is entitled to recovery for these violations.

## COUNT VII: UNJUST ENRICHMENT

559.    Orange County realleges and incorporates the preceding paragraphs 1 through 558 as if fully set forth herein.

560.   As a direct and proximate result of the unlawful conduct alleged herein, Defendants have been and will continue to be unjustly enriched.

561.   Defendants have financially benefitted from their unlawful scheme through the increased sale of covered drugs with the greatest spread.

562.   It would be inequitable for Defendants to retain any of the overpayments made by Orange County which are ill-gotten gains, garnered as a result of the scheme alleged herein.

563.   A such, Plaintiff seeks an accounting and disgorgement of these gains and their return to Orange County, along with any further appropriate relief for these violations, from each Defendant.

**COUNT VIII:       VIOLATION OF NEW YORK GENERAL BUSINESS LAW §
            349 Et Seq. (DECEPTIVE ACTS UNFAIR TRADE
            PRACTICES)**

564.   Orange County realleges and incorporates the preceding paragraphs 1 through 563 as if fully set forth herein.

565.   As detailed above, in order to create a demand for their products and garner increased profits, Defendants intentionally engaged in a scheme of price inflation and manipulation for Medicaid covered drugs which are administered to consumers.

566.   Defendants' actions had a harmful and pervasive impact on the well-being of all Orange County consumers. Defendants' purposeful scheme resulted in direct injury to the tax paying consumers of Orange County by increasing their Medicaid burden.

567. Orange County is required to balance its budget. Defendants' scheme created an additional and unwarranted burden prevented the tax paying residents of Orange County from receiving additional benefits and services that could have otherwise been included in its budget.

568. Further, it is Orange County's statutory obligation to take care of its needy residents: "[m]edical assistance for needy persons is hereby declared to be a matter of public concern and a necessity in promoting the public health and welfare." N.Y. Soc. Serv. L. § 363. Orange County's ability to fulfill this and other obligations to its residents was severely hampered by Defendants' deceptive scheme.

569. Specifically, Defendants' deceptive practices against the consumers of Orange County included the following among other practices:

(a) Defendants purposefully manipulated and inflated the AWPs of their drugs which are sold in the stream of commerce and are used as the basis of Orange County's reimbursement of Medicaid costs;

(b) Defendants engaged in the deceptive practice of incentivizing commercial buyers into promoting their products by offering a lower and/or diluted price to commercial buyers which was not and is not disclosed or offered to Medicaid, and which caused Orange County to overpay for said products;

(c) Defendants failed to report their best prices for their products and cheated Medicaid out of rebates in order to drive up their own profits and in turn, the costs paid by Orange County;

(d)     Defendants violated several state and federal laws, including 42 U.S.C. 1396r (Medicaid's "best price" requirement), 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), 18 U.S.C. § 1962(c) and (d) (RICO), New York Social Service Laws § 367-a and 145-b, and 18 N.Y.C.R.R. § 515.2(b)(4) and (5), which may serve as predicates for their violation of  New York General Business Law § 349.

570.     Defendants' deceptive and wrongful conduct described herein occurred and continues to occur as they engage in business throughout Orange County.  Defendants' practices have caused direct injury to Orange County by causing it to overpay millions of dollars in Medicaid costs.  This has a lasting and harmful impact on the tax dollars spent by the consumers and residents of Orange County.  By reason thereof, Orange County is entitled to recovery.


## COUNT IX:  EQUITABLE SUBROGATION

571.     Orange County realleges and incorporates the preceding paragraphs 1 through 570 as if fully set forth herein.

572.     Because it is Orange County's statutory obligation to take care of its needy residents, Plaintiff is entitled to equitable subrogation.

573.     New York Social Services Law § 363 provides, in relevant part, that: "[m]edical assistance for needy persons is hereby declared to be a matter of public concern and a necessity in promoting the public health and welfare."  N.Y. Soc. Serv. L. § 363.

574.     Pursuant to New York State's Medicaid federally approved plan and New York's Social Service Laws, Orange County is obligated to pay 25% of the cost of all pharmaceuticals for

qualified Medicaid recipients in its residence. N.Y. Soc. Serv. L. §§ 61 and 363-a.

575.    In discharging this obligation, Orange County has paid and continues to pay for the Defendants' pharmaceuticals on behalf of its approximately 50,000 qualifying residents. And, as a consequence of discharging this obligation based on AWPs which were false and inflated Orange County overpaid.

576.    As such Orange County, at all times relevant hereto, fully discharged its payment obligations in accordance with federal and state law, and is therefore entitled to recovery.

## COUNT X:   FRAUD

577.    Orange County realleges and incorporates the preceding paragraphs 1 through 576 as if fully set forth herein.

578.    Defendants intentionally and maliciously reported inflated and false pricing information as its AWPs on which they knew Medicaid reimbursements are based.

579.    Defendants made false representations with knowledge of their falsity, concealed material facts with the intention of overcharging Orange County, and Orange County detrimentally relied on these misrepresentations. As a direct and proximate result of Orange County's reliance it has suffered injuries that were foreseeable to the Defendants.

580.    Defendants also knew or intentionally disregarded facts that created a high probability of injury to Orange County, and deliberately acted in conscious or intentional disregard of, or with indifference to, the high probability of this injury.

581.    Defendants committed fraud when they knowingly and intentionally submitted inflated AWPs to the publishers for the express purpose of perpetuating the fraudulent scheme described herein.

582.    Because Orange County detrimentally relied on Defendants' knowing and intentional misrepresentations, Orange County is entitled to recovery.

## COUNT XI:  FRAUDULENT CONCEALMENT

583.    Oranges County realleges and incorporates the preceding paragraphs 1 through 582 as if fully set forth herein.

584.    The Defendants named herein each fraudulently concealed from Orange County their inflation and falsification of AWPs.  In doing so, the Defendants fraudulently concealed the actual true costs of the covered drugs for which Orange County pays, as well as their practice of offering chargebacks, rebates, discounts, and free samples to providers which dilute the actual cost paid by those providers.

585.    Because Defendants guarded this information as confidential they purposefully and fraudulently concealed it from Orange County.  Specifically, each Defendant concealed that:

a.    AWPs, WACS, or other pricing information provided to publishers was    not accurate or representative of the actual costs at which Defendant sold its products;

b.    A vast majority of the products were sold for a substantial discount off the reported price and these discounts were routinely negotiated with providers;

-162-

c.      Defendants instructed drug distribution intermediaries to keep confidential prices they paid for covered drugs;

d.      Defendants offered kickbacks and incentives to providers and drug distribution intermediaries to detract their support for any investigations or changes into the AWP system;

e.      Defendants' calculations of Medicaid rebates and best prices did not account for all rebates and incentives, as required by law;

f.      Defendants' submission of best prices were false and inaccurate;

g.      Defendants' rebates to the states were false and inaccurate;

h.      Defendants marketed the spread in order to create demand for its products and increased profits.

586.    Despite its vigilant administration, 25 percent payment, and supervision of its Medicaid Program, Orange County only discovered recently that it too was a victim of Defendants' fraudulent scheme. Through no fault of its own, Orange County only recently became aware of the facts supporting this Complaint and the injuries it has suffered as of late.

587.    Orange County could not have reasonably discovered the fraudulent nature of Defendants' AWPs on its own, because Defendants possessed sole knowledge of this active fraud.

588.    Defendants had an affirmative duty to disclose to Orange County that the AWPs relied upon were inflated and false and that Orange County was overpaying for every covered prescription drug.

-163-

589.   This affirmative duty is based on Defendants contractual, statutory, and legal obligations to provide Medicaid with the "best price" and true and reliable AWPs:  42 U.S.C. §1396r-8; N.Y. Soc. Svc. Law §§367(A)(7)(D) and 145-b.

590.   Because of the foregoing, Orange County is entitled to recovery.

**PRAYER FOR RELIEF**

591.   WHEREFORE, Plaintiff Orange County prays for judgement against all Defendants named herein, jointly and severally, as follows:

(a)   Awarding Plaintiff actual, statutory, treble and all other available damages for Defendants' violation of 18 U.S.C. § 1962(c);

(b)   Adjudging and decreeing that Defendants engaged in the intentional and fraudulent conduct alleged herein in violation of New York Social Services Law §§ 367-a(7)(d), 366-b and 42 U.S.C. § 1396r-8 and 18 N.Y.C.R.R. § 515.2(b)(4) and (5);

(c)   Awarding Orange County actual, statutory, and all other available money damages, including interest, for Defendants' violation of New York General Business Law § 349 in an amount to be determined at trial;

(d)   Awarding Orange County actual, statutory, treble and all other available money damages, including interest, for Defendants' violation of New York Social Services Law § 145-b in an amount to be determined at trial;

(e)    Awarding Orange County actual, statutory, and all other available money damages, including interest, for Defendants' breach of contract;

(f)    Awarding Orange County actual, statutory, and all other available money damages, including interest, for Defendants' intentional fraud;

(g)    Ordering each Defendant to prepare an accounting to determine the amounts of their illegal profits at Orange County's expense, and disgorgement to Orange County of such monies, with interest;

(h)    Imposing a constructive trust and ordering Defendants to pay restitution to Orange County in the amount Orange County has been overcharged plus interest;

(i)    Awarding Plaintiff the costs of the suit, including all costs, reasonable attorney's fees and experts' fees pursuant to 18 U.S.C. § 1964(c), New York General Business Law § 349, and New York Social Services Law § 145-b;

(j)    Such other further and different relief as the Court deems just and proper.

Dated:    April 5, 2007

LEVY PHILLIPS & KONISGBERG, LLP
800 Third Ave. 13th Floor
New York, New York 10022

By: _____
Stanley J. Levy (SJ 7200)
Theresa A. Vitello (TV 0623)

ORANGE COUNTY DEPARTMENT OF LAW
255 Main St
Goshen, New York 10924

By: _____
David Darwin
Orange County Attorney